[S. F. No. 22694. In Bank. Mar. 25. 1970.]

MERTON PRICE, Plaintiff and Respondent, v.
SHELL OIL COMPANY, Defendant, Cross-complainant and Appellant;
FLYING TIGER LINE, INC., Cross-defendant and Respondent;
PACIFIC EMPLOYERS INSURANCE COMPANY,
Intervener and Respondent.

246

## COUNSEL

O'Connor, Cohn & Lynch, O'Connor, Moran, Cohn & Lynch and Cyril Viadro for Defendant, Cross-complainant and Appellant.

Werchick & Werchick, Arne Werchick and Jack H. Werchick for Plaintiff and Respondent.

Bledsoe, Smith, Cathcart, Johnson & Rogers and Robert A. Seligson for Cross-defendant and Respondent.

No appearance for Intervener and Respondent.

## OPINION

**SULLIVAN, J.**—We hold in this case that the doctrine of strict liability in tort which we have heretofore made applicable to sellers of personal property is also applicable to bailors and lessors of such property. As appears *infra,* we find substantial evidence in the record that the lessor in the present matter falls within the reach of the doctrine. We therefore affirm the judgment entered on the verdicts in favor of plaintiff Merton Price and plaintiff in intervention Pacific Employers Insurance Company (Pacific) and against defendant Shell Oil Company (Shell). On a secondary issue, presented by Shell's cross-complaint against cross-defendant Flying Tiger Line, Inc. (Flying Tiger) we hold that Shell's aforementioned liability as lessor does not fall within the indemnity provisions of its lease so as to impose on Flying Tiger an obligation to indemnify. We therefore affirm the judgment of nonsuit in favor of Flying Tiger dismissing Shell's cross-complaint for indemnity. In sum, we uphold the judgments of the trial court.

Plaintiff is an aircraft mechanic employed by Flying Tiger. In 1958 Flying Tiger leased from defendant Shell a gasoline tank truck with a movable ladder mounted upon the tank for refueling certain types of aircraft. Under the terms of the lease Flying Tiger was obligated to maintain the equipment in safe operating condition and to make specified repairs not here relevant. All other repairs were to be made by Shell at the request of Flying Tiger.

In 1962 Shell, at Flying Tiger's request, removed the original ladder from the truck. A replacement, built by an undisclosed manufacturer, was furnished and installed under Shell's direction. Both Shell and Flying Tiger participated in the inspection of the new ladder. On March 12, 1964, about two years later, while plaintiff was climbing the ladder onto the wing of an aircraft, both of its legs split into segments. Plaintiff fell against the gasoline

tank, hanging by his leg which was caught between the rungs of the upper segment of the ladder still attached to the aircraft wing. As a result he sustained serious personal injuries.

Plaintiff brought the instant action for damages against Shell. His complaint was in two counts: the first based on Shell's alleged negligence in manufacturing and maintaining a gasoline tank truck; the second based on an alleged breach of warranties that the tank truck and all its parts were free from defects, of merchantable quality and fit for the purpose for which they were intended to be used.

As we have already indicated, Shell cross-complained against Flying Tiger for indemnity but was nonsuited. On defendant's motion the trial court also nonsuited plaintiff on both of his pleaded causes of action but on its own motion submitted the case to the jury on the theory of strict liability in tort. The jury returned a verdict in favor of plaintiff and against Shell in the sum of $40,000, and in favor of plaintiff in intervention Pacific, the workman's compensation insurance carrier of Flying Tiger, and against Shell for $1,859.24 for medical and indemnity benefits paid by Pacific in connection with Price's injuries. Shell appeals both from the judgment entered on the above verdicts and the judgment of nonsuit dismissing its cross-complaint against Flying Tiger for indemnity. We turn first to defendant's attack on the verdicts.

*Application of the Rule of Strict Liability*

Shell contends that the trial court erred in submitting the case to the jury on the issue of strict liability. It argues that it is not a manufacturer, distributor or retailer of gasoline trucks. On the contrary, Shell asserts that in the present circumstances it was a bailor or lessor and that its liability as such was governed solely by Civil Code section 1955 which imposed on Shell no greater duty than that of exercising ordinary care.[1] In support of

---

[1]Civil Code section 1955 provides: "One who lets personal property must deliver it to the hirer, secure his quiet enjoyment thereof against all lawful claimants, put it into a condition fit for the purpose for which he lets it, and repair all deteriorations thereof not occasioned by the fault of the hirer and not the natural result of its use."

This section contains a statutory declaration of the obligations of a lessor of personalty and declares the duty of a bailor in terms of an implied warranty of the fitness of the chattel for the use intended. (*Holmes Packaging Machinery Corp.* v. *Bingham* (1967) 252 Cal.App.2d 862, 868 [60 Cal.Rptr. 769]; see also *Tierstein* v. *Licht* (1959) 174 Cal.App.2d 835, 841 [345 P.2d 341]; *Sproul* v. *Cuddy* (1955) 131 Cal.App.2d 85, 93 [280 P.2d 158].) In *McNeal* v. *Greenberg* (1953) 40 Cal.2d 740, 742 [255 P.2d 810], we said that a "bailor's implied warranty of fitness does not make him an insurer against all personal injuries suffered from the defective operation of the bailed chattel. He impliedly warrants only that he has exercised reasonable care to ascertain that the chattel is safe and suitable for the purpose for which it is hired." Thus in the words of *Tierstein, supra:* "The duty of a bailor for hire is sometimes expressed in terms of an implied warranty of the fitness of the chattel for the use

this contention Shell notes that section 408 of the Restatement Second of Torts[2] "continues to hold" *lessors* of personal property liable only for negligence although section 402A[3] now imposes strict liability upon sellers of such property. From this premise Shell argues that the Restatement did not intend to apply strict liability to lessors.

■ The rule is now settled in California that "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897].) A retail dealer, being an "integral part of the overall producing and marketing enterprise" (*Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 262 [37 Cal.Rptr. 896, 391 P.2d 168]), is similarly liable. (See also *Elmore* v. *American Motors Corp.* (1969) 70 Cal.2d 578 [75 Cal.Rptr. 652, 451 P.2d 84]; Prosser, *Strict Liability to the Consumer in California* (1966) 18 Hastings L.J. 9.)

■ We have given this rule of strict liability a broad application. Recently in the *Elmore* case, *supra,* we extended its protection to injured bystanders, a category not covered by the Restatement which limited its application to harm caused "to the ultimate user or consumer."[4] (Rest. 2d Torts, § 402A;

intended. However, whether such warranty is implied from the common law of bailments or from the statutory duties imposed by Civil Code, section 1955, it is generally recognized that it is not an absolute warranty, making the bailor an insurer or guarantor, but a warranty by the bailor that he has exercised reasonable care to ascertain that the chattel is safe and suitable for the purpose for which it is hired." (Fn. omitted.) (*Tierstein* v. *Licht, supra,* 174 Cal.App.2d 835, 841.)

[2]Section 408 of the Restatement Second of Torts provides: "One who leases a chattel as safe for immediate use is subject to liability to those whom he should expect to use the chattel, or to be endangered by its probable use, for physical harm caused by its use in a manner for which, and by a person for whose use, it is leased, if the lessor fails to exercise reasonable care to make it safe for such use or to disclose its actual condition to those who may be expected to use it."

[3]Section 402A of the Restatement Second of Torts provides:
"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
"(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

[4]Restatement Second of Torts, section 402A, comment o, provides in part: "Casual bystanders, and others who may come in contact with the product, . . . have been denied recovery. There may be no essential reason why such plaintiffs should not be brought within the scope of the protection afforded, other than that they do not

see fn. 3, *ante*.) We there observed that the doctrine of strict liability may not be limited either "on a theory of privity of contract" or "on the theory that no representation of safety is made to the bystander." (70 Cal.2d at p. 586.) Emphasizing that our formulation was not restrictive, we pointed out that "in both *Greenman* and *Vandermark* we did not limit the rules stated to consumers and users but instead used language applicable to human beings generally." (*Id*.)

Such a broad philosophy evolves naturally from the purpose of imposing strict liability which "is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." (*Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57, 63.)[5] Essentially the paramount policy to be promoted by the rule is the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them. Thus the court in *Kriegler* v. *Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224 [74 Cal.Rptr. 749], while noting that the rule of strict liability had theretofore been applied in California only to manufacturers, retailers and suppliers of personal property, found no difficulty in extending its application to builders engaged in the mass production and sale of homes.[6]

Similarly we can perceive no substantial difference between *sellers* of personal property and *non-sellers,* such as bailors and lessors. In each instance, the seller or non-seller "places [an article] on the market, knowing that it is to be used without inspection for defects, . . ." (*Greenman* v. *Yuba Power Products, Inc., supra,* at p. 62.) In the light of the policy to be subserved, it should make no difference that the party distributing the article has retained title to it. Nor can we see how the risk of harm associated with

---

have the same reasons for expecting such protection as the consumer who buys a marketed product; . . . The Institute expresses neither approval nor disapproval of expansion of the rule to permit recovery by such persons."

[5]"The rationale of that [*Greenman*] case does not rest on the analysis of the financial strength or bargaining power of the parties to the particular action. It rests, rather, on the proposition that 'The cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business.' (*Escola* v. *Coca Cola Bottling Co.,* 24 Cal.2d 453, 462 [150 P.2d 436]. . . .)" (*Seely* v. *White Motor Co.* (1965) 63 Cal.2d 9, 18-19 [45 Cal.Rptr. 17, 403 P.2d 145].)

Compare Comment, *Negligent Entrustment, Proximate Cause and Resource Allocation* (1968) 41 So.Cal.L.Rev. 440, especially at p. 453, fn. 72, and authorities cited therein comprising the so-called Blum and Kalven-Calabresi debate.

[6]"We think, in terms of today's society, there are no meaningful distinctions between Eichler's mass production and sale of homes and the mass production and sale of automobiles and that the pertinent overriding policy considerations are the same." (*Kriegler* v. *Eichler Homes, Inc., supra,* 269 Cal.App.2d 224, 227.)

the use of the chattel can vary with the legal form under which it is held. Having in mind the market realities and the widespread use of the lease of personalty in today's business world, we think it makes good sense to impose on the lessors of chattels the same liability for physical harm which has been imposed on the manufacturers and retailers. The former, like the latter, are able to bear the cost of compensating for injuries resulting from defects by spreading the loss through an adjustment of the rental.

Two recent decisions support this view. In *Cintrone v. Hertz Truck Leasing & Rental Service* (1965) 45 N.J. 434 [212 A.2d 769], the court held that a lessor of trucks is liable upon the basis of strict liability in tort because "A bailor for hire, such as a person in the U-drive-it business, puts motor vehicles in the stream of commerce in a fashion not unlike a manufacturer or retailer," subjects such a leased vehicle "to more sustained use on the highways than most ordinary car purchasers," and by the very nature of his business, exposes "the bailee, his employees, passengers and the traveling public . . . to a greater *quantum* of potential danger of harm from defective vehicles than usually arises out of sales by the manufacturer." (212 A.2d at p. 777.)[7]

A similar result was reached in this state in *McClaflin v. Bayshore Equipment Rental Co.* (1969) 274 Cal.App.2d 446 [79 Cal.Rptr. 337]. In that case a bailor of maintenance equipment was held strictly liable when a leased stepladder collapsed, resulting in the death of the bailee. The court reasoned: "Lessors of personal property, like the manufacturers or retailers thereof, 'are engaged in the business of distributing goods to the public. They are an integral part of the overall . . . marketing enterprise that should bear the cost of injuries resulting from defective products.' (*Vandermark v. Ford Motor Co., supra,* 61 Cal.2d 256 at p. 262.) In some cases the lessor 'may be the only member of that enterprise reasonably available to the injured plaintiff' (*id.*), and the imposition of strict liability upon him serves, as in the case of the retailer, as an incentive to safety. (See *id.*) This will afford maximum protection to the injured plaintiff while working no injustice upon the lessor: the latter can recover the cost of the protection by charging for it in his business. (See *id.,* at pp. 262-263.)" (274 Cal.App.2d at p. 452.)

■ Our conclusion to this effect creates no conflict with Civil Code section 1955 and the cases construing it. (See fn. 1, *ante.*) Nothing in that statute purports to make it an exclusive remedy. (See *McClaflin v. Bayshore*

---

[7]The court observed that "By means of a bailment parties can often reach the same business ends that can be achieved by selling and buying." (212 A.2d at p. 776.)

*Equipment Rental Co., supra,* at p. 451; cf. *Monroe* v. *East Bay Rental Service* (1952) 111 Cal.App.2d 574, 575-576 [245 P.2d 9].) Through that enactment the Legislature simply imposed certain duties upon lessors of personal property but in doing so manifested no intention to limit liability for their breach. There is no inconsistency between liability under this section, where it applies, and the rule of strict liability. Accordingly, the cases construing this section cannot be dispositive of the issue of whether strict liability in tort applies to a lessor of personalty.

Nor are we dissuaded from our above conclusion by Shell's somewhat oblique argument that the Restatement Second of Torts in section 408 imposes on *lessors* of personal property liability only for negligence while in section 402A it imposes strict liability only on *sellers* of such property. This is no more than saying what is obvious—that the doctrine of strict liability as articulated in the Restatement was not made' applicable against lessors or bailors. As we have explained, we think it should be, just as in *Elmore* we thought it should be made applicable in favor of the "bystander," even though the authors of the Restatement refrained from expressing such a view.

For the above reasons, we are of the opinion that the doctrine of strict liability in tort should be made applicable to bailors and lessors of personal property in the same manner as we have held it applicable to sellers of such property. Mindful of the purpose of such doctrine as explicated by us in *Greenman* and *Vandermark* and most recently in *Elmore* we can find no significant difference between a manufacturer or retailer who places an article on the market by means of a sale and a bailor or lessor who accomplishes the same result by means of a lease. (See *Cintrone* v. *Hertz Truck Leasing & Rental Service, supra,* 212 A.2d 769, 776.) In today's society with "the growth of the business of renting motor vehicles, trucks and pleasure cars" (*Cintrone* v. *Hertz Truck Leasing & Rental Service, supra*) and the persistent advertising efforts to put one "in the driver's seat" (*id.* at p. 776) we have no difficulty in finding the doctrine peculiarly applicable to the lessor of motor vehicles. The very reasons which impelled us to apply the doctrine in *Greenman* urge us to apply it in the instant case.

However, since we reason by analogy, we make clear that the doctrine should be made applicable to lessors in the same way as we have made it applicable to sellers. In *Greenman, supra,* we fastened liability on a manufacturer "when an article *he places on the market, . . .* proves to have a defect . . . ." (59 Cal.2d at p. 62, italics added.) In *Vandermark* we again emphasized the necessity for a continuous course of business as a condition to application of the rule: "Retailers like manufacturers are

*engaged in the business* of distributing goods to the public. . . . Strict liability . . . works no injustice to the defendants, *for they can adjust the costs of such protection between them in the course of their continuing business relationship."* (61 Cal.2d at pp. 262-263.) In *Seely, supra,* we used language of similar tenor in speaking of "an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products" and in stressing the importance of "requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm." (63 Cal.2d at p. 18.) In *Cintrone, supra,* the court using a phrase somewhat like the one noted above in *Greenman,* observed that a "bailor for hire . . . puts motor vehicles *in the stream of commerce* in a fashion not unlike a manufacturer or retailer." (212 A.2d at p. 777; italics added.) That the doctrine was thus applicable in a commercial setting was made explicit in *Conroy* v. *10 Brewster Ave. Corp.* (1967) 97 N.J. Super. 75 [234 A.2d 415], which held that *Cintrone* only applies to the "mass producer" or "mass lessor." (234 A.2d at pp. 418-419.) The same rule appears in the Restatement,[8] and California has held in several cases that strict liability does not apply to isolated transactions. (See *Avner* v. *Longridge Estates* (1969) 272 Cal.App.2d 607, 609, 614 [77 Cal.Rptr. 633] (application to a mass builder of homes); *Kriegler* v. *Eichler Homes, Inc., supra,* 269 Cal.App.2d 224, 227-229 (same); *Conolley* v. *Bull* (1968) 258 Cal.App.2d 183, 195-197 [65 Cal.Rptr. 689] (no application to seller of a single parcel of real estate); *Halliday* v. *Greene* (1967) 244 Cal.App.2d 482, 486-487 [53 Cal.Rptr. 267] (same).)

Our analysis of these authorities leads to the conclusion that for the doctrine of strict liability in tort to apply to a lessor of personalty, the lessor should be found to be in the business of leasing, in the same general sense as the seller of personalty is found to be in the business of manufacturing or retailing.

Shell contends that even if the issue of strict liability was properly submitted to the jury, nevertheless Shell cannot be held liable under such doctrine since there is no evidence in the record that it leased more than one tank truck. It argues in effect that, unlike the lessor in *Cintrone,* Shell was not in the business of leasing such trucks.

This contention is without merit. There is ample evidence in the record indicating that Shell was engaged in more than a single lease transaction. The testimony of Brendemuhl, Shell's plant superintendent in charge of the distribution of aviation fuel, established that Shell was engaged in an organ-

---

[8]Restatement Second of Torts, section 402A, comment f, provides in part: "The rule does not, however, apply to the occasional seller of food or other such products who is not engaged in that activity as a part of his business. . . ."

ized and continuing operation.[9] It also showed that trucks were leased to lessees other than Flying Tiger.[10]

Finally, the lease agreement itself warrants the inference that Shell was engaged in the business of leasing gasoline tank trucks and that the lease now before us was not an isolated or occasional transaction. This document, which is a part of the record on appeal, is entitled "Automotive Equipment Lease" and consists of two pages of *printed,* single spaced, standard-form provisions concerning term, rent, lessee's maintenance duties, taxes and fees, indemnity insurance, assignments and subleasing, and notice. Significantly, the name "Shell Oil Company" or "Shell" appears in print throughout the document. The provisions for description of the exact type of chassis and tank indicate that the standard-form lease is used only for refueler trucks. The provision for description of the number, make, size and rating of ancillary equipment—filters, meters, hose reels, reel hoses, pumps and fire extinguishers—as well as a general provision for "other equipment" with spaces to be filled in, warrants the inference that Shell had a wide variety of refueler trucks which were leased under the provisions of its standard-form automotive equipment leases.

[9]Brendemuhl testified that Shell leased Flying Tiger a gasoline truck as part of its aircraft fuel sales operation. When asked "Do you lease them [Flying Tiger] one or more than one truck?" he replied "Only one truck *here.*" (Italics added.) When asked "How many similar tank trucks do you have operating out of the San Francisco Airport?" he answered *"Exactly like this one*—I can only guess that we have possibly ten—*just like it."* (Italics added.) He was then asked "Now, you have—in addition to those ten trucks—you have other tank trucks operating in the San Francisco International Airport?" to which he answered in the affirmative. He also testified that these trucks were "built to a set of standard plans of Shell Oil Company . . . ." and that Shell had a practice of borrowing equipment from laid-up trucks to be transferred to operative units. Finally, Brendemuhl testified that provision was made for a replacement truck whenever Flying Tiger's leased truck had to be removed from service for any extended maintenance.

[10]Questioned as to whether the truck involved in the Price accident had ever been transferred by Shell to another airport, Brendemuhl explained that, "if you mean by 'transfer' a permanent transfer . . . where it would have been removed from leasehold by Flying Tiger Lines and *transferred to some other lessee . . .* it was not." (Italics added.) When asked "Is [the ladder atop some refueler trucks] used by lessees for any other purposes?" he replied "I don't know." Plaintiff's counsel then rephrased the question: "Have you ever observed that ladder in use by *any* lessee for any other purpose?" (Italics added.) The witness answered "No, sir—except for fueling." Brendemuhl was also asked "Do you know whether this truck had been leased to any other organization prior to the time that you entered into the agreement with Flying Tiger Lines?" The answer was "This truck *had not been leased to any other firm."* (Italics added.) One of Shell's counsel, in clarifying a question, asked the witness if the truck leased to Flying Tiger had been modified "as distinguished to the kind of truck *they give to any kind of an airline."* (Italics added.) At trial, Shell's counsel, in responding to an offer to stipulate that "Shell drew this lease in the standard form that is used for all similar equipment that it leased," stated "Whether it was *for all similar forms of equipment,* I don't know. But I'll stipulate to that. I'll stipulate that Shell drew this particular lease." (Italics added.)

In view of the foregoing we are satisfied that there is substantial evidence showing, or from which it can be reasonably inferred, that Shell was a commercial lessor within the rule of strict liability applicable to this case.

### The Indemnity Provisions of the Lease

The Shell lease provides in relevant part: "Lessee shall indemnify Shell against any and all claims and liability for injury or death of persons or damage to property caused by or happening in connection with the equipment or the condition, maintenance, possession, operation or use thereof." Shell's cross-complaint against Flying Tiger was grounded on the above indemnity clause and prayed that if plaintiff recovered damages against Shell, the court enter judgment on the cross-complaint against Flying Tiger in a like amount plus the amount of Shell's attorney fees, court costs and investigation expenses. In its answer thereto, Flying Tiger asserted by way of affirmative defenses that Shell was not entitled to indemnity because "it was actively negligent in supplying a defective ladder" to Flying Tiger and it breached its written lease by so doing, and because under the circumstances "equity and good conscience" required a denial of indemnity. The trial court nonsuited Shell on the cross-complaint on the ground that the indemnity clause was "in general terms" and not sufficiently specific to provide indemnity where Shell was responsible either because of its active negligence or on a basis of strict liability which the court considered to be "in the same category."

Shell contends that in granting the nonsuit the trial court erred because (1) the indemnity clause clearly covered the accident in question and, (2) in any event Shell's responsibility based on strict liability in tort, amounts to no more than passive negligence and therefore does not preclude indemnity.

Since the parties to the tank-truck lease expressly contracted with respect to the lessee's duty to indemnify the lessor, "the extent of that duty must be determined from the contract and not from the independent doctrine of equitable indemnity. [Citations.]" (*Markley* v. *Beagle* (1967) 66 Cal.2d 951, 961 [59 Cal.Rptr. 809, 429 P.2d 129].) Where, as in the instant case, the indemnity clause was construed by the trial court without the aid of extrinsic evidence, we are not bound by such construction and the interpretation of the clause is a question of law for this court. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]; *Markley* v. *Beagle, supra,* at p. 962.)

In *Markley, supra,* we summarized the rules governing express contracts of indemnity as follows: "An indemnity clause phrased in general terms will

not be interpreted, however, to provide indemnity for consequences resulting from the indemnitee's own actively negligent acts. [Citations.] Mere non-feasance, however, such as a negligent failure to discover a dangerous condition arising from the work will not preclude indemnity under a general clause such as the one in this case." (66 Cal.2d 951, 962.)[11] ▮ As we said in *Goldman* v. *Ecco-Phoenix Elec. Corp.* (1964) 62 Cal.2d 40, 44 [41 Cal.Rptr. 73, 396 P.2d 377]: "Although the cases have held that one may provide by agreement for indemnification against his own negligence [citations], the agreement for indemnification must be clear and explicit; the agreement must be strictly construed against the indemnitee." (Fn. omitted.)

In both *Markley* and *Goldman* we relied upon our previous decision in *Vinnell Co.* v. *Pacific Elec. Ry. Co., supra,* 52 Cal.2d 411 [340 P.2d 604]. There we dealt with a broadly drawn indemnity clause under which the plaintiff-contractor "releases and agrees to indemnify and save [defendant] Railroad harmless from and against any and all injuries to and deaths of persons, claims, demands, costs, loss, damage and liability, *howsoever same may be caused* resulting *directly or indirectly* from the performance of any or all work. . . ." (52 Cal.2d at p. 414; italics added.) We held that in the absence of a specific agreement to protect the indemnitee railroad against the consequences of its own negligence, the indemnity clause could not be construed to do so. "[I]f an indemnitor such as the plaintiff is to be made responsible for the negligent acts of an indemnitee over whose conduct it has no control, the language imposing such liability should do so expressly and unequivocally so that the contracting party is advised in definite terms of the liability to which it is exposed. The indemnification clause in the present case, by not expressly stating that the defendant was protected against acts of its own negligence, failed to meet this requirement." (*Vinnell Co.* v. *Pacific Elec. Ry. Co., supra,* at pp. 416-417.)[12]

▮ In the indemnity clause before us in the instant case, there is no language "expressly and unequivocally" requiring Flying Tiger to indemnify

---

[11]Citing *Goldman* v. *Ecco-Phoenix Elec. Corp.* (1964) 62 Cal.2d 40, 44-45 [41 Cal.Rptr. 73, 396 P.2d 377]; *Harvey Machine Co.* v. *Hatzel & Buehler, Inc.* (1960) 54 Cal.2d 445, 448-449 [6 Cal.Rptr. 284, 353 P.2d 924]; *Vinnell Co.* v. *Pacific Elec. Ry. Co.* (1959) 52 Cal.2d 411, 415 [340 P.2d 604]; *Baldwin Contracting Co.* v. *Winston Steel Works, Inc.* (1965) 236 Cal.App.2d 565, 571-573 [46 Cal.Rptr. 421]; *Safeway Stores, Inc.* v. *Massachusetts Bonding & Ins. Co.* (1962) 202 Cal.App.2d 99, 111-113 [20 Cal.Rptr. 820].

[12]We noted in *Vinnell* that the California rule was in accord with the weight of authority: " 'In the overwhelming majority of the cases the result reached by their interpretational efforts can be condensed into the simple rule that where the parties fail to refer expressly to negligence in their contract such failure evidences the parties' intention not to provide for indemnity for the indemnitee's negligent acts.' (Annot. 175 A.L.R. 8.)" (*Vinnell Co.* v. *Pacific Elec. Ry. Co., supra,* at p. 415.)

Shell for liability or damages caused by Shell's own act in furnishing a defective tank truck or its equipment. No language of such essential specificity indicates that the lesseee is to be held responsible for the negligent acts of the lessor, much less for the strict liability in tort imposed upon the lessor for placing on the market a defective article.[13] Indeed it would do violence to the doctrine of strict liability and thwart its basic purpose, if we were to interpret so general a clause as transferring the liability for a defective article from the party putting the article in the stream of commerce, to the user or consumer of the article who is within the class the doctrine was designed to protect.

The judgments are affirmed.

Tobriner, Acting C. J., McComb, J., Peters, J., Mosk, J., and Burke, J., concurred.

---

[13]Even if our constructional problem were one involving uncertainty (which it is not) we would be obliged to construe the indemnity provisions strictly against Shell who prepared the lease. (Civ. Code, § 1654; *County of Alameda* v. *Southern Pac. Co.* (1961) 55 Cal.2d 479, 488 [11 Cal.Rptr. 751, 360 P.2d 327].)