[No. 14633-9-II.    Division Two.    December 14, 1993.]

RICK BUTTELO, ET AL, *Appellants,* v. S.A. WOODS-YATES
AMERICAN MACHINE CO., INC., ET AL,
*Respondents.*

*Rodney B. Ray* and *Margullis, Luedtke & Ray,* for appellants.

*Timothy R. Gosselin* and *Burgess, Fitzer, Leighton & Phillips, P.S.,* for respondents.

PETRICH, J.[*] — Rick Buttelo's left arm was amputated below the elbow when he was sharpening the rotating planer knives of an industrial woodworking machine that his employer, Western Dry Kilns, Inc. (Western), leased from Paxport Mills, Inc. (Paxport). Buttelo appeals the trial court's dismissal by summary judgment of his products liability and negligence claims against Paxport. We affirm.

---

[*]Judge John A. Petrich was a member of the Court of Appeals at the time oral argument was heard on this matter. He is now serving as a judge pro tempore of the court pursuant to CAR 21(c).

Paxport, a lumber mill, and Western, a custom remanufacturer of wood products, are related corporations. Paxport owns the majority of Western's shares; Paxport's majority shareholder and president, Chauncey Griggs, is also one of Western's officers and directors. Although Paxport and Western maintain separate offices and production facilities, the two corporations have overlapping payroll and clerical functions; occasionally, each lends the other the services of its production and maintenance employees. Another significant connection between the two companies is their longstanding lease agreement, under which Western leases machinery and equipment for use in its manufacturing process. The machine that injured Buttelo is subject to this agreement.

The machine that injured Buttelo is a used molder and planer that was built in 1925 by the S.A. Woods-Yates American Machine Company. In January of 1987, Jay Garrison, Western's production superintendent, ordered the used molder from Burton Machinery, an Oregon dealer in used woodworking equipment. Burton Machinery shipped the molder directly to Western's production facility.

When the molder arrived at Western's production facility, Harley Sykes supervised its installation. Sykes also supervised Schneider & Simpson Sheet Metal's installation of the ductwork above the molder, which vacuumed sawdust away from the work area. Sykes had been in charge of rearranging Western's production facility to accommodate the molder and several other pieces of equipment since January. Sykes had been on Western's payroll since June of 1986, when Western's production superintendent, Jay Garrison, had hired him on a contract basis to install Western's boiler system and chip bin. Sykes had performed contract work for both corporations at various times over the preceding years.

A few days after the molder was installed, Buttelo was cleaning it for the next day's run when he noticed that one of its blades was nicked. Buttelo started the machine so that he could sharpen the blade. The molder, when shipped to its original owner, had a crank and screw apparatus that allowed the

operator to stand back from the machine during the sharpening process. This crank and screw apparatus was missing, which made it necessary for Buttelo to grab the sharpening stone and to manually pull it across the spinning blades. Had this originally furnished apparatus been intact and properly attached to the molder, Buttelo's hand would not have been positioned above the knives during the sharpening operation. During the blade sharpening process, part of the duct work, which was located above the molder and held up by suction, dropped, striking Buttelo's arm and forcing it into the moving blades.

Buttelo named Schneider-Simpson Sheet Metal and Paxport as defendants in an amended complaint after his earlier claims against the manufacturer and the seller of the machine had been dismissed. Schneider-Simpson and Paxport were dismissed on their motions for summary judgment. This appeal is from the trial court's dismissal of Paxport.

In reviewing a summary judgment order, this court makes the same inquiry as the trial court. *Touchet Vly. Grain Growers, Inc. v. Opp & Seibold Gen. Constr., Inc.*, 119 Wn.2d 334, 341, 831 P.2d 724 (1992). This court will affirm the award "if there is no genuine issue of material fact or if reasonable minds could reach only one conclusion on that issue based upon the evidence construed in the light most favorable to the nonmoving party." *Weatherbee v. Gustafson*, 64 Wn. App. 128, 131, 822 P.2d 1257 (1992) (citing *Sea-Pac Co. v. United Food & Comm'l Workers Local Union 44*, 103 Wn.2d 800, 802, 699 P.2d 217 (1985)). Where, as here, the defendant is the movant, summary judgment of dismissal is appropriate if the defendant meets the initial burden of showing an absence of an issue of material fact and the plaintiff fails to produce evidence sufficient to establish the existence of each essential element of his claim. *Young v. Key Pharmaceuticals, Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). We affirm the trial court's dismissal since Buttelo has failed to produce evidence sufficient to establish the existence of each essential element of his claim.

The parties have agreed that this case is controlled by Washington's products liability act, as codified in RCW 7.72. To prevail on his products liability claim, Buttelo needed to establish, among other things, that Paxport was a "product seller" and that Paxport's negligence proximately caused his injury. RCW 7.72.040(1)(a). Buttelo contends that he has produced evidence sufficient to raise genuine issues of fact on these two elements of his claim. We disagree.

We first address Buttelo's failure to demonstrate that Paxport was a "product seller" within the meaning of the statute. The statute defines a product seller as any person or entity engaged in the business of selling or leasing products. RCW 7.72.010(1). By its plain terms, the statute differentiates between those who are "in the business" of leasing or selling and those who are not. Only those who are "in the business of" leasing or selling are "product sellers". Thus, Paxport is a product seller only if it was in the business of leasing products.

The statute does not define the activities that constitute the business of leasing. When the meaning of a statute cannot be derived from a plain reading, a court may use various tools of statutory construction to interpret its meaning. *Morris v. Blaker*, 118 Wn.2d 133, 142, 821 P.2d 482 (1992). In interpreting the meaning of a statute the court's "fundamental objective . . . is to ascertain and carry out the intent of the Legislature." *Rozner v. Bellevue*, 116 Wn.2d 342, 347, 804 P.2d 24 (1991) (citing *Bellevue Fire Fighters Local 1604 v. Bellevue*, 100 Wn.2d 748, 751, 675 P.2d 592 (1984), *cert. denied*, 471 U.S. 1015 (1985)). The Legislature's intent can be determined by reference to the statute's underlying purpose. *Roza Irrig. Dist. v. State*, 80 Wn.2d 633, 637-38, 641, 497 P.2d 166 (1972). Legislative intent can also be derived from the body of common law that was preempted by the statute. *See State v. A.N.W. Seed Corp.*, 116 Wn.2d 39, 45, 802 P.2d 1353 (1991). Our examination of the Legislature's purpose in passing the products liability act, and of the body of common law preempted by the act, persuades us that Paxport was not "in the business of leasing."

Before the Legislature enacted Washington's products liability act, Washington courts had already concluded that product lessors could be subject to products liability claims. *Baker v. Seattle*, 79 Wn.2d 198, 484 P.2d 405 (1971). In *Baker*, the court invalidated a contractual disclaimer that would have relieved the product lessor from the strict liability standard imposed on product sellers. In refusing to uphold the disclaimer, the *Baker* court reasoned, in part, that such disclaimers were unenforceable in the sale of goods and there was no practical distinction between a seller and a lessor. *Baker*, 79 Wn.2d at 201. The court said:

> The reasons for imposing the warranty of fitness in sales cases are often present in lease transactions. Public policy demands that in this day of expanding rental and leasing enterprises the consumer who leases be given protection equivalent to the consumer who purchases.

*Baker*, at 201 (quoting *W.E. Johnson Equip. Co. v. United Airlines, Inc.*, 238 So. 2d 98 (Fla. 1970)).

The *Baker* court did not explain why or under what circumstances it would hold a product lessor liable for injuries caused by its leased product. However, other courts have done so, and these courts generally hold that a product lessor will be subject to a products liability claim when the quantity and magnitude of its leasing activities indicate that doing so will advance the public policies supporting the duty. *See Rivera v. Mahogony Corp.*, 145 Ill. App. 3d 213, 215, 494 N.E.2d 660, 662 (1986); *Price v. Shell Oil Co.*, 2 Cal. 3d 245, 466 P.2d 722, 85 Cal. Rptr. 178 (1970); *Patriot Gen. Life Ins. Co. v. CFC Inv. Co.*, 11 Mass. App. Ct. 857, 420 N.E.2d 918 (1981); *Nath v. National Equip. Leasing Corp.*, 497 Pa. 126, 439 A.2d 633 (1982). *See generally* Annot., *Products Liability: Application of Strict Liability in Tort Doctrine to Lessor of Personal Property*, 52 A.L.R.3d 121 (1973).

Several policy reasons justify imposing on product sellers a duty to protect the public from unsafe products. First, the product seller is in a better position than the consumer to "exert pressure on the manufacturer to enhance the safety of the product." *See, e.g., Rivera*, at 215 (quoting *Hammond v.*

*North Am. Asbestos Corp.*, 97 Ill. 2d 195, 454 N.E.2d 210 (1983)). Second, the consuming public typically looks to the seller for advice on selecting, operating, and maintaining the product. *W.E. Johnson*, 238 So. 2d at 100. Finally, the product seller is in a better position than the consumer to absorb the cost of any injury caused by the product because the product seller can spread the costs of injury among the entire consuming public. *See, e.g., Price*, at 248-49.

These policy reasons are not advanced when a sale involves an isolated or casual transaction. When the seller is engaged in an isolated or casual transaction, the seller has insufficient volume to influence the product's design or manufacture or to spread the cost of injury over the consuming public. Also, the low volume seller generally lacks the expertise that would induce a buyer's reliance. Because a seller who is involved in an isolated or casual transaction is no better able than the consumer to prevent or to absorb the cost of any injury, courts have been unwilling to hold these sellers to the standard of care imposed on sellers who are "in the business" of selling products.

For the same reasons, where a lease involves an isolated or casual transaction, courts have been unwilling to hold the lessor to the standard of care imposed on those who make it their business to lease such products. *See Price*, at 248; *Bachner v. Pearson*, 479 P.2d 319 (Alaska 1970); *Niffenegger v. Lakeland Constr. Co.*, 95 Ill. App. 3d 420, 420 N.E.2d 262 (1981); *Gilbert v. Stone City Constr. Co.*, 171 Ind. App. 418, 357 N.E.2d 738 (1976). In other words, courts generally hold product lessors to the standard of care imposed on a product seller when the lessor is "found to be in the business of leasing, in the same general sense as the seller of personalty is found to be in the business of manufacturing or retailing." *Price*, at 254.

Before Washington courts had the opportunity to discuss the scope of the holding in *Baker*, the Legislature acted, superseding the common law of products liability. The resulting statutory scheme reflects the Legislature's reaction, at least in part, to the same concerns expressed by the forego-

ing authorities. For example, RCW 7.72.010 clearly differentiates between the casual or occasional seller and the seller who is engaged in selling on a regular basis as part of its overall business enterprise. RCW 7.72.010(1) reads in relevant part as follows:

> "Product seller" means any person or entity that is engaged in the business of selling products . . .. [T]he term includes a manufacturer, wholesaler, distributor, or retailer of the relevant product.

Also, the statute clearly differentiates between those who have actual control over the product and those who act as mere conduits in the chain of distribution. RCW 7.72.010(1) provides in pertinent part that:

> The term "product seller" does not include:
> (d) A finance lessor who is not otherwise a product seller. A "finance lessor" is one who acts in a financial capacity, who is not a manufacturer, wholesaler, distributor, or retailer, and who leases a product without having a reasonable opportunity to inspect and discover defects in the product, under a lease arrangement in which the selection, possession, maintenance, and operation of the product are controlled by a person other than the lessor . . ..

In short, the statutory scheme supports the view that products liability principles should be applied only when the policies underlying the duty to guard against injuries caused by products will be advanced; *i.e.*, only when the volume of transactions is sufficient to give the seller or lessor the ability to guard against and to pay for any injury. In other words, a product lessor's liability should be limited to cases where the lessor's leasing activities are sufficiently great to justify holding it accountable for the acts of the manufacturer. *See* RCW 7.72.040; Talmadge, *Washington's Product Liability Act*, 5 U. Puget Sound L. Rev. 1, 10-11 (1981).

■ A restrictive interpretation of the statute is consistent with legislative history reflecting a clear desire to limit the scope of defendants who are subject to products liability claims. In the preamble, the Legislature stated:

> It is the intent of the legislature that the right of the consumer to recover for injuries sustained as a result of an unsafe product not be unduly impaired. *It is further the intent of the*

*legislature that retail businesses located primarily in the state of Washington be protected from the substantially increasing product liability insurance costs and unwarranted exposure to product liability litigation.*

(Italics ours.) Laws of 1981, ch. 27, § 1. The Legislature's intent to limit, rather than to expand, liability is also reflected in the report of the Senate Select Committee on Tort and Product Liability Reform by the statute's principal author:

> One of the complaints most frequently expressed before the Legislature during the whole course of the product liability discussion over the past few years has been the alleged inequity of holding the non-manufacturing product seller liable for product defects over which it had no control by application of the concept of joint and several liability throughout the chain of distribution. This section addresses that concern and relieves a non-manufacturing product seller of such liability except in certain limited situations.

Senate Journal, 47th Legislature (1981), at 632.

In light of the foregoing, we conclude that Paxport's scant leasing activities are insufficient to warrant the application of products liability principles. The affidavits establish that Paxport's business was milling lumber. There is no evidence that Paxport ever engaged in the manufacture or sale of this type of equipment or that Paxport ever used this type of equipment in its own manufacturing process. There is nothing in the record to indicate that Paxport ever entered into a lease with any entity other than with Western.

Not only is Paxport's leasing activity restricted to the instant lease, the facts indicate that the lease was primarily, if not exclusively, for Western's benefit. The lease enabled Western to acquire equipment without expending its own capital and generated only token income for Paxport. There is no indication in the record that this leasing arrangement helped defray Paxport's own operating expenses because there is no evidence that Paxport ever had or ever would have any use for such equipment.

The evidence shows that Paxport gave Western no reason to rely on Paxport to make the Woods-Yates molder safe. Western's production superintendent, Jay Garrison, selected and ordered the machine. According to the terms of the lease,

Western had the duty to inspect the machine and the responsibility for keeping it in good repair. Also, Western assumed the risk of loss and damage to the machine and was required to insure it. Paxport leased the machine to Western without ·making any warranties, express or implied, regarding the machine's condition, merchantability or fitness for any particular purpose. While Paxport retained title to the machine, Paxport never obtained possession or control of the machine. In fact, Western was in a superior position to ensure the Woods-Yates molder's safety because Western selected, installed, maintained, repaired and operated the molder. Since Burton delivered the molder directly to Western's production facilities, Paxport had never even inspected the equipment. Under the facts of this case, we hold that Paxport was not in the business of leasing the type of equipment that injured Buttelo, and that Paxport is not a product seller for the purposes of Washington's products liability statute.

■ We next address Buttelo's contention that Paxport is vicariously liable for Harley Sykes's alleged negligence in supervising the molder's installation. To establish Paxport's liability for Sykes's conduct, Buttelo needed to present some evidence from which a reasonable trier of fact could infer that Paxport was either Sykes's employer or principal.

The only fact on this issue is the following excerpt from Sykes's deposition, which Buttelo asserts is reasonably susceptible of the inference that Sykes was Paxport's employee or agent at the relevant time:

Q: Was there one person that would call you back or that you considered to be your boss or contact person at Paxport when you were working there from '79 to '83?

A: Mr. Chauncey Griggs was my superior, and he was also the owner.

The foregoing excerpt does not support an inference that, at the time that Sykes installed the molder, Paxport and Sykes had a relationship giving rise to vicarious liability. To the contrary, all competent evidence in the record supports the conclusion that Sykes was employed by or controlled by Western. The evidence shows that Sykes was called back to

work by Bill Chaney in Chaney's capacity as Western's production superintendent; that Sykes was hired by Jay Garrison, Western's production superintendent; that Sykes was placed on Western's payroll; and that, after being placed on Western's payroll he worked exclusively on Western's projects and reported exclusively to Western's management. In short, Buttelo has failed to produce any evidence to support his contention that Paxport was vicariously liable for any of Sykes's actions.

Because Buttelo failed to establish facts to support his contention that Paxport is a "product seller" within the meaning of Washington's products liability statute, and because Buttelo failed to establish facts to support his contention that Paxport is vicariously liable for any of Sykes's alleged negligence, Buttelo has failed to produce evidence to support each essential element of his cause of action against Paxport. Therefore, we affirm the trial court's decision to dismiss this case on summary judgment.

SEINFELD, A.C.J., and MORGAN, J., concur.