57 P.3d 1191 (2002)
Alan ALMQUIST and Gerri Almquist, husband and wife, individually, and as co-Guardians ad litem, for Alan Wayne "A.J." Almquist, a minor; Joseph Chrisp and Alicia Chrisp, husband and wife, individually, and as co-Guardians ad litem, for Shayla Chrisp, a minor; Frank Hall and Sherri Hall, husband and wife, individually, and as co-Guardians ad litem, for Kevin Fisk, a minor; Gary Henderson and Debbi Henderson, husband and wife, individually, and as co-Guardians ad litem, for Jacqueline de-Bit, a minor; John Maxwell and Donna Maxwell, husband and wife, individually, and as co-Guardians ad litem, for Faith Maxwell, a minor; Doug Oquist and Tami Oquist, husband and wife, individually, and as co-Guardians ad litem, for Ariel Oquist, a minor; Carl Paris and Lorri Kaneaster, husband and wife, individually, and as co-Guardians ad litem, for Zachary Paris, a minor; Robert Voss and Regina Voss, husband and wife, individually, and as co-Guardians ad litem, for Jacquelynn Voss, a minor; Ken Cox and Kelly Cox, husband and wife, individually, and as co-Guardians ad litem, for Jorden Cox, a minor; Zene and Shelley Stillar, husband and wife, individually, and as co-Guardians ad litem, for Kimberly Price, a minor; Perry and Carrie Scott, husband and wife, individually, and as co-Guardians ad litem, for Kelley M. Scott, a minor, Respondents,
v.
THE FINLEY SCHOOL DISTRICT No. 53, a local governmental entity, Appellant,
Northern States Beef, a foreign corporation, Defendant.
No. 21091-0-III.
Court of Appeals of Washington, Division 3, Panel Nine.
November 21, 2002.
*1193 William R. Hickman, Pamela A. Okano, Reed, McClure, Seattle, WA, Gerald J. Moberg, Attorney at Law, Ephrata, WA, Diehl R. Rettig, Rettig, Osborne, Forgette, O'Donnell, Kennewick, WA, for Appellant.
William D. Marler, Bruce T. Clark, Denis W. Stearns, Marler, Clark, Seattle, WA, Charles K. Wiggins, Kenneth W. Masters, Wiggins Law Office, Bainbridge Island, WA, for Respondents.
*1192 SWEENEY, J.
The Washington Product Liability Act (Product Liability Act or Act) imposes strict liability on the manufacturer of a defective product. RCW 7.72.010(4); Hyjek v. Anthony Indus., 133 Wash.2d 414, 944 P.2d 1036 (1997). The Finley School District No. 53 prepared and sold tacos tainted with E. coli[1] 0157:H7 bacteria. We conclude that the Product Liability Act applies to the sales of tacos from a school and that processing frozen ground beef into cooked tacos constitutes "manufacturing" as defined by the Act. We further hold that the Act imposes liability for a secondary victimone who did not eat the tainted product but contracted E. coli poisoning from someone who did. We therefore affirm the judgment entered on the jury's verdict.

HISTORY
The Finley School District prepared and served a taco lunch for its students using frozen ground beef supplied by Northern States Beef. The District thawed and cooked the meat; drained off the fat and rinsed the meat; added refried beans, tomato paste, and seasonings; and mixed it up. It then delivered the meat mixture in pans to the schools, including Finley Elementary, for distribution from cafeterias.
Eleven children became infected with E. coli 0157:H7 bacteria in October 1998. Ten attended Finley Elementary. The eleventh was a two-year-old playmate of two of the affected students. The Benton-Franklin Health District investigated. Members of the Washington State Department of Health and the National Centers for Disease Control *1194 joined the investigation. Dr. John Kobayashi, epidemiologist for communicable diseases for the Washington State Department of Health, headed the investigation. The investigative team concluded:
As no other common school activity was identified other than eating at the school cafeteria, it is reasonable to conclude that a meal served at the school was the likely source of illness. Cattle are the known reservoir of E. coli 0157:H7. Thus, it is likely that consuming the ground beef served in the tacos was the vehicle.
Ex. 1 at 7. The team concluded that the taco meal was the "most probable source" of the outbreakmeaning a greater than 50 percent certainty. Report of Proceedings (RP) at 172.
The team concluded that two-year-old Faith Maxwell was a "secondary case." Ex. 1 at 9. Secondary cases often result from fecal-oral contamination. They generally make up from 1 to 10 percent of the cases caused by an outbreak. Faith spent considerable time with two children who ate the taco meal in question, one of whom had a confirmed case of E. coli poisoning. One of the children also spent the night at Faith's house and played with her, including dressing her up. Faith's treating physician diagnosed her with E. coli linked to the outbreak caused by the taco meal. Other investigators supported his conclusion.

PROCEEDINGS
The parents of the afflicted children (Plaintiffs) sued the District and Northern States Beef. They alleged that both the District and Northern States were manufacturers of a product (the taco filling) that was not reasonably safe. As such, both were strictly liable under the Product Liability Act for the children's harm.
Northern States Beef settled and was dismissed.
Plaintiffs moved for summary judgment against the District on the issue of liability. The trial court ruled as a matter of law that the defective "product" for the purposes of the Act was the taco filling, not the frozen meat, and that the District's processing of frozen hamburger into cooked taco filling made it a "manufacturer" under the Act. As such, it held that the District was strictly liable if the taco meals caused the E. coli outbreak. The two latter questions (whether the food was tainted and whether the tainted food was the cause of the outbreak) were left for the jury. The court granted the District's motion to bifurcate the proceedings on liability and damages. The case then went to the jury on the limited issue of whether the District's taco lunch contained E. coli and caused the children's harm. Clerk's Papers (CP) at 646-49.
Plaintiffs' proof showed that the E. coli outbreak was caused by the tacos served at Finley Elementary on October 6. The District's proof showed that its cooking procedures were more than adequate to kill any potential pathogens, including E. coli The jury was then asked to answer three questions: whether the taco filling contained E. coli; if so, whether that caused each plaintiff's illness; and, if so, what percentage of fault should be allocated to the District and the supplier.
The jury found that the taco meal did contain E. coli and was the cause of the plaintiffs' injuries. It found the District 100 percent at fault and Northern States Beef not at fault.

DISCUSSION
I. WAS THE DISTRICT A "PRODUCT MANUFACTURER" UNDER THE WASHINGTON PRODUCT LIABILITY ACT?
The Act holds manufacturers of defective products strictly liable for resulting injuries. A "product" is an object "produced for introduction into trade or commerce." RCW 7.72.010(3). A "manufacturer" is any seller of the product who "designs, produces, makes, fabricates, constructs, or remanufactures the relevant product or component part of a product before its sale to a user or consumer." RCW 7.72.010(2). This includes an original creator or intermediate seller who does more than merely pass along, unchanged, a previously packaged product. But the Act expressly excludes from "product seller" a provider of professional services. That is, one "who utilizes or sells products within the legally authorized scope of the *1195 professional practice of the provider." RCW 7.72.010(1)(b). The District argues at the outset that it falls within this exclusion as a professional provider of educational services.
But at trial the District argued that the relevant product was the frozen ground beef and Northern States was the only manufacturer. The District argued it was a mere "product seller," at best, because it did not modify this product. And, finally, as a nonmanufacturing seller, the District was not strictly liable. The trial judge rejected these arguments based on his reading of the Act.
A. Applicability of the Act.
The District now contends that there was no "product," of any kind, for the purposes of the Act because the lunches were sold only to school students and staff and not offered to the public at large. Therefore, the argument goes, it produced nothing for introduction into "trade or commerce." But we can find no such argument in this trial record.
Simply put, these substantial legal theories advanced on appeal were not urged upon the trial judge in the first instance. We need not entertain them for the first time here. Our approach is well founded and routinely applied.[2] Issues cannot, with only limited exceptions, be raised for the first time on appeal. RAP 2.5(a);[3]Wells v. W. Wash. Growth Mgmt. Hearings Bd., 100 Wash.App. 657, 681, 997 P.2d 405 (2000). The District argued during the summary judgment proceeding on liability that it was not a manufacturer because the product was frozen meat. The District was then a consumer or, at most, a nonmanufacturing product seller. CP at 903-09. It made no argument that it was not engaged in trade or commerce and that no product therefore came into being. Nor did it argue that it was exempt from liability as a professional services provider. CP at 903-09; CP at 438-41.
Throughout the summary judgment proceeding, counsel for the District repeatedly referred to the meat as the product:
So I think you have to go back to taking the big picture and look at it, and the big picture to look at it is there has to be something that the retailer does that qualifies as manufacturing, modification, something like that. And there just isn't in this case.
So what happens is, and the statute I think is fairly well crafted and I think really ideally fits in this case and I think may not make a difference practically in the end, because what the statute says is, "All right. If you're not a manufacturer but you're a retailer, you can still be liable. You can be liable for your negligence, that is, `We didn't cook it hot enough,'" which is entirely the case that the plaintiff has made out against the district is that they are negligent because they didn't cook out whatever [E. coli] 0157:H7 was in the product or that we cross contaminated, which would be negligent actions which would clearly fit under the statute as making us as a nonmanufacturing retailer liable, if that was proven. That's the very issue that I believe that this jury is entitled to review is that what, if anything, did the district do that would have made this product through its negligence a harmful product? Because we inherited the product how it was.

*1196 RP (Dec. 14, 2000) at 10-11 (emphasis added).
In posttrial proceedings following the adverse liability verdict, the District moved for a new trial, arguing that victim Faith Maxwell did not fall within the purview of the Act because she had no contact with the product. CP at 104-08. Again, the District did not challenge the application of the Act to either the product or itself as a product seller at trial.
We also need not entertain arguments that are patently inconsistent with the positions advanced at trial. Kohl v. Zemiller, 12 Wash.App. 370, 373, 529 P.2d 861 (1974).
That said, and in consideration of the public interest aspects of this case, we would conclude that the lunch was a product, in any event.
The District relies on McKenna v. Harrison Memorial Hospital for the proposition that, if the sale or distribution of a product is strictly incidental to the dispensing of professional services, the distributor is not subject to the Product Liability Act. McKenna v. Harrison Mem'l Hosp., 92 Wash.App. 119, 121-22, 960 P.2d 486 (1998). McKenna is distinguishable. There, a surgeon implanted a medical device, secured by screws and rods, in a patient's back. The court held that the device, including the screws and rods, was part and parcel of the professional services and not, therefore, subject to the Product Liability Act. Id. at 121, 124-25, 960 P.2d 486.
But here, the lunch was a stand-alone product. It was sold independently of any professional service. The District thawed, cooked, rinsed, drained, seasoned, and assembled taco filling from frozen ground beef. "Products" parallel to the medical device in McKenna for a school district might be rulers, pencils, paper, or chalk, distributed for a fee, incidental to the provision of educational services. So, for example, if the McKenna hospital cafeteria had sold tainted tacos, the distribution of those meals, while certainly incidental to the primary function of a hospital, would nonetheless have been the sale of a product.
When an organization such as an educational institution, medical institution, or research institution also provides food for a fee, we are not prepared to hold that those sales are so intricately tied to the provision of "services" that they are exempt from the Product Liability Act.
B. Manufacturer.
Next, the District repeats its trial contention that the relevant "product" was the frozen ground beef. And Northern States was therefore the sole "manufacturer."
Statutory construction is a question of law so review is de novo. Cockle v. Dep't of Labor & Indus., 142 Wash.2d 801, 807, 16 P.3d 583 (2001). We try to effect legislative intent. Id. And we try to avoid unlikely, absurd, or strained results. City of Walla Walla v. Topel, 104 Wash.App. 816, 820, 17 P.3d 1244 (2001).
On the merits, the District denies that it was a "manufacturer" as defined by the Product Liability Act, in any event. Procedurally, the District argues that this is a fact question for the jury and should not, therefore, have been resolved as a question of law.
As to the District's argument that the question is one of fact, we note that the material facts here were not disputed. The District conceded that it stored, thawed, cooked, drained, rinsed, seasoned, and mixed what started out as frozen ground beef. The question of what legal consequences might flow from these activitieswhether this constitutes manufacturingwas then properly decided by the court as a matter of law. See, e.g., Harris v. Ski Park Farms, Inc., 120 Wash.2d 727, 736, 844 P.2d 1006 (1993).
Under the Act, a "`manufacturer' includes a product seller who designs, produces, makes, fabricates, constructs, or remanufactures the relevant product or component part of a product before its sale to a user or consumer." RCW 7.72.010(2). Since the relevant synonyms are not defined by the statute, we give them their dictionary definition. Washburn v. Beatt Equip. Co., 120 Wash.2d 246, 259-61, 840 P.2d 860 (1992).
To "design" includes "the process of selecting the means and contriving the elements, steps, and procedures for producing what will adequately satisfy some need." WEBSTER'S *1197 THIRD NEW INTERNATIONAL DICTIONARY 611 (1993). To "produce" means "to give being, form, or shape to: make often from raw materials." WEBSTER'S, at 1810. "Make" includes "to bring (a material thing) into being by forming, shaping, or altering material." WEBSTER'S, at 1363. "Fabricate" includes "to form into a whole by uniting parts." WEBSTER'S, at 811. "Construct" includes "to form, make, or create by combining parts or elements." WEBSTER'S, at 489.
Here, the District began the process with 180 pounds of frozen ground beef. The frozen beef was thawed and then cooked in a steam kettle. Once cooked, the fat was drained off. The meat was rinsed. And refried beans, tomato paste, and seasonings were added. The taco meat was later scooped onto a tortilla along with other condiments and side dishes and then served.
The District thus had a "design" for cooking this meatits recipe. It made taco meat by combining ground beef with other ingredients. It then used the taco meat as part of its taco lunch. The District's cooking process falls neatly into each of the definitions for "produce," "make," "fabricate," and "construct." WEBSTER'S, at 1810, 1363, 811, 489.
The District was not merely a retailer. The reason for excluding nonmanufacturing retailers from strict liability is to distinguish "between those who have actual control over the product and those who act as mere conduits in the chain of distribution." Buttelo v. S.A. Woods-Yates Am. Mach. Co., 72 Wash. App. 397, 404, 864 P.2d 948 (1993). The District did not simply resell frozen ground beef, seasonings, and tortillas as a grocery store would. It took raw ingredients and made a taco lunch out of them. It then sold them.
The District is a manufacturera manufacturer of tacos.
II. PROXIMATE CAUSE OF FAITH MAXWELL'S INJURIES
Proximate cause is generally a question of fact. Hertog v. City of Seattle, 138 Wash.2d 265, 275, 979 P.2d 400 (1999). Proximate cause consists of two elements cause in fact (but-for cause) and legal causation (legal policy). Schooley v. Pinch's Deli Mkt., Inc., 134 Wash.2d 468, 478, 951 P.2d 749 (1998).
Cause in fact is based on a "physical connection between an act and an injury" and is determined by the trier of fact. Id.; Hartley v. State, 103 Wash.2d 768, 778, 698 P.2d 77 (1985). Cause in fact requires a direct unbroken sequence between some act and the complained of event. Hertog, 138 Wash.2d at 282-83, 979 P.2d 400. This is generally a question for the jury.
Legal cause, on the other hand, reflects policy determinations as to how far the consequences of a defendant's acts should extend. Schooley, 134 Wash.2d at 478, 951 P.2d 749; Hartley, 103 Wash.2d at 779, 698 P.2d 77. Legal cause is a question of law. Schooley, 134 Wash.2d at 478, 951 P.2d 749.
A. Cause in Fact.
The District first says that there is not enough evidence here for a jury to find that the taco meal caused (nonstudent) Faith Maxwell's illness.
Faith's treating physician, Dr. Phillip Tarr, testified that:
In [view] of the high-frequency of infections the time-space cluster of infections in the Finley area during the week or weeks preceding her transfer to Children's, I would haveI would come to the conclusion that she was part of that same time-space cluster. The exact mechanism of her infection would be beyond my ability to render an opinion.
RP at 88-89. Dr. Kobayashi agreed with Dr. Tarr that Faith's illness was part of the same time-space cluster of the Finley E. coli outbreak. He testified that the connection between the product and Faith's illness satisfied the definition of a probable case. RP at 202.
Dr. Andrew Pavia testified that "it is extremely likely that Faith was a secondary case that resulted from the outbreak at Finley Elementary School." RP at 331. Dr. Russell Alexander testified:
Q. Are you aware that Dr. Kobayashi, Dr. Tarr, Dr. Pavia have all testified that on a more-likely-than-not basis that Faith *1198 Maxwell is a secondary case tied to this outbreak?
A. I know they have said that, and I would agree.
RP at 624.
Secondary cases are not uncommon, generally making up 1 to 10 percent of the total cases in any outbreak. RP at 623-24. Secondary infection generally results from person-to-person contact, most often via the fecal-oral route. RP at 88, 201-02, 245, 248.
To conclude that this is how Faith was infected is more than mere speculation. Faith spent time with two children who ate the taco meal. One had a confirmed case of E. coli infection. An infected child spent the night at Faith's house and played with her, including dressing her up like a baby.
These facts are consistent with the experts' description of the typical secondary infection. And the District offered no plausible alternative explanation for her illness. The jury then had adequate evidence from which to infer that Faith's illness was caused in fact by the tainted taco meal. Hanson v. Estell, 100 Wash.App. 281, 286, 997 P.2d 426 (2000).
B. Legal Cause.
The District's legal causation challenge also relies on the fact that Faith did not have contact with the product. The District contends that the Act does not then accommodate her cause of action.
The Act defines a claimant as "any person or entity that suffers harm." RCW 7.72.010(5). It also states: "A claim may be asserted under this chapter even though the claimant did not buy the product from, or enter into any contractual relationship with, the product seller." RCW 7.72.010(5). For us, this includes Faith's claim. And recent case law supports this.
In McCoy v. American Suzuki Motor Corp., Mr. McCoy was injured while attempting to render assistance to the occupants of a Suzuki Samurai that had swerved and rolled off the highway. McCoy v. Am. Suzuki Motor Corp., 136 Wash.2d 350, 353, 961 P.2d 952 (1998). Specifically, he was injured by a hit-and-run driver while returning to his vehicle some two hours after the accident. Id. Mr. McCoy filed suit against Suzuki under the Product Liability Act. Id. at 353-54, 961 P.2d 952. The court determined that the injury satisfied the test for legal cause. And a jury should determine cause in fact. Id. at 359-61, 961 P.2d 952.
There, as here, Mr. McCoy had no direct contact with the Suzuki Samurai. He was neither a driver nor a passenger. He was not struck by the Samurai. Id. at 353-54, 961 P.2d 952. The court nonetheless held there were no policy reasons demonstrating that Suzuki's "liability should be cut off as a matter of law." Id. at 360, 961 P.2d 952. Nor do we find any policy reasons to end the District's liability here.
The Act does not limit "claimants" to those who have direct contact with the product. Indeed, the Act broadly defines the class of persons who may bring a product liability claim. RCW 7.72.010(5).
Finally, the District relies on Washington State Physicians Insurance Exchange and Association v. Fisons Corp. for the proposition that the Act limits the class of people who can be "claimants." Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wash.2d 299, 858 P.2d 1054 (1993). Fisons is not applicable.
There, the issue was whether a doctor who prescribed a defective drug for a patient could recover damages from the drug's maker for his own emotional pain and suffering all secondary to his patient's resulting injury. Id. at 318-19, 858 P.2d 1054. Here, the injuries are, first of all, physicalnot emotional. And, second, the injuries proximately flow from a foreseeable sourcea child who eats E. coli-tainted meatnot someone watching someone else suffer.
We affirm the judgment on the verdict.
WE CONCUR: KATO, A.C.J., and KURTZ, J.
NOTES
[1] Escherichia coli.
[2] Sorrel v. Eagle Healthcare, Inc., 110 Wash.App. 290, 299, 38 P.3d 1024 (2002) ("Where the trial court had no opportunity to address the issue, we decline to consider it."); Lindblad v. Boeing Co., 108 Wash.App. 198, 207, 31 P.3d 1 (2001) ("We will not review an issue, theory, argument, or claim of error not presented at the trial court level."); Demelash v. Ross Stores, Inc., 105 Wash. App. 508, 527, 20 P.3d 447 (2001) ("We generally will not review an issue, theory or argument not presented at the trial court level."). "The purpose of this rule is to afford the trial court an opportunity to correct errors, thereby avoiding unnecessary appeals and retrials." Demelash, 105 Wash.App. at 527, 20 P.3d 447.
[3] RAP 2.5(a) provides, in relevant part:

The appellate court may refuse to review any claim of error which was not raised in the trial court. However, a party may raise the following claimed errors for the first time in the appellate court: (1) lack of trial court jurisdiction, (2) failure to establish facts upon which relief can be granted, and (3) manifest error affecting a constitutional right.
The appropriate standard of review for the claimed error does not affect whether the error was in fact raised in the lower court.