Filed 7/8/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JANINE HERNANDEZ,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>ENTERPRISE RENT-A-CAR<br>COMPANY OF SAN FRANCISCO et al.,<br><br>    Defendants and Respondents. | A152703<br><br>(San Mateo County<br>Super. Ct. No. CIV518068) |

In 2004, Janine Hernandez was a passenger in a 1992 Oldsmobile Cutlass that was involved in a head-on collision with another car. Hernandez, who was 11 years old at the time, was seriously injured. In 2012, she filed this action against Enterprise Rent-A-Car and its affiliates (Enterprise) to recover damages resulting from the car accident, alleging a single cause of action for strict products liability. In 2017, the trial court granted Enterprise summary judgment. Because Enterprise did not succeed to whatever liability for this accident a different car rental company might have had, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Hernandez contends the 1992 Oldsmobile Cutlass involved in her 2004 accident was defective because it was not designed to be crashworthy. Specifically, she alleges that the Oldsmobile did not provide adequate protection to children riding in the back seat when the vehicle was involved in a frontal collision. Hernandez does not here attempt to hold the product manufacturer liable for this alleged defect. Instead, she contends that a rental car company called National Car Rental Systems (NCRS) would have been strictly

1

liable for her damages because NCRS placed the Oldsmobile "into the stream of commerce," and that Enterprise is strictly liable as a successor in interest of NCRS.

Although Hernandez filed this action in 2012, the case was stayed for several years while she litigated an identical legal claim against other alleged affiliates of NCRS in San Joaquin County. Following a defense judgment in the San Joaquin County case, Hernandez amended her pleading in this case, filing her operative second amended complaint on March 17, 2016.

In April 2017, Enterprise moved for summary judgment. The motion was supported by evidence establishing the following facts about the ownership history of the Oldsmobile involved in Hernandez's accident: The car was manufactured by General Motors Corporation. From May 1992 until February 1993, NCRS used the Oldsmobile in its car rental business. On February 26, 1993, NCRS transferred ownership of the Oldsmobile to a married couple (the S. family). The Oldsmobile was transferred to another private party in 2000 and again in February 2004.

The summary judgment evidence also established the following facts about NCRS: In 1995, NCRS sold the assets of its rental car business to NCR Acquisition. NCRS then changed its name to GM National Holding Co. and in 1996 merged with General Motors Corporation. Meanwhile, NCR Acquisition changed its name to National Car Rental Systems (New NCRS). In 2001, New NCRS declared bankruptcy. In 2003, Cerberus Capital Management L.P. purchased the assets of New NCRS pursuant to an "Asset Purchase Agreement" that was approved by the bankruptcy court.

According to Hernandez's complaint, Enterprise is a joint owner of the assets of the NCRS rental car business that were purchased by Cerberus in 2003. Enterprise did not dispute this allegation in its summary judgment motion.

In July 2017, the trial court granted Enterprise summary judgment, finding that Hernandez could not hold Enterprise strictly liable for damages allegedly caused by the defective Oldsmobile for two reasons. First, as a lessor of the vehicle, the original NCRS was strictly liable for a lessee's damages resulting from a product defect, but its exposure to strict liability ended when it sold the Oldsmobile to the S. family as a used car.

2

Second, even if NCRS retained strict liability for the defective Oldsmobile, that liability cannot be traced to Enterprise.

## DISCUSSION

Summary judgment may be granted "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) "We review a trial court's grant of summary judgment de novo. [Citation.] '[T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact.' " (*Casey v. Perini Corp.* (2012) 206 Cal.App.4th 1222, 1228.)

Hernandez contends that summary judgment of her case must be reversed because there are triable issues regarding (1) NCRS's strict liability for alleged defects in the Oldsmobile, and (2) Enterprise's liability as a successor of NCRS. We question whether Enterprise has established, as a matter of law, that NCRS was not strictly liable for defects in the 1992 Oldsmobile after it sold the vehicle. However, we need not resolve those difficult issues because the summary judgment evidence establishes no triable issue on the second ground upon which summary judgment was granted, regarding Enterprise's liability as a successor of the original NCRS.

Even if NCRS would have been strictly liable for a defect in the 1992 Oldsmobile, Hernandez has to establish that Enterprise acquired successor liability for the alleged defect. Hernandez argues she can make this showing by establishing that (1) New NCRS became strictly liable for the product defect in the Oldsmobile when it acquired the assets of NCRS, and then (2) the Cerberus entities became strictly liable for that defect when they purchased the assets of New NCRS out of bankruptcy. We conclude this successor liability theory fails as a matter of law on both of these points.

## I.  Successor Liability Principles

3

Under generally accepted rules, when a corporation purchases the principal assets of another corporation, "the purchaser does not assume the seller's liabilities unless (1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." (*Ray v. Alad Corp.* (1977) 19 Cal.3d 22, 28 (*Alad*).)

In *Alad*, the Supreme Court carved out an exception to these traditional rules by establishing a three-prong test for plaintiffs in product liability cases to hold a successor to a manufacturer strictly liable for the plaintiff's injuries. (*Alad*, *supra,* 19 Cal.3d at pp. 30–31.) Under the *Alad* test, a corporation that purchases the assets of a manufacturing business assumes the seller's liabilities for a defective product when all of the following elements are established: (1) the plaintiff's remedies against the seller are virtually destroyed by the purchaser's acquisition of the business; (2) the purchaser has the ability to assume the seller's risk-spreading role; and (3) it is fair to require the purchaser to assume responsibility for the defective products as a burden necessarily attached to the seller's goodwill, which the purchaser enjoys in the continued operation of the business. (*Ibid.*)

Though originally applied to a product manufacturer, the *Alad* test is now used to determine successor liability for other entities that participated in the production and distribution of a defective product. (*Kaminski v. Western MacArthur Co.* (1985) 175 Cal.App.3d 445, 453–454 (*Kaminski*); *Phillips v. Cooper Laboratories* (1989) 215 Cal.App.3d 1648, 1654 (*Phillips*).) Given the policies underlying strict liability, "[w]hen a distributor or retailer acquires a corporation and takes advantage of its goodwill and other corporate assets and facilities to inject the predecessor's product line into the stream of commerce, it continues 'the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products.' " (*Kaminski* at p. 456.) Courts applying this test have emphasized that the successor does not have to cause the destruction of the plaintiff's remedies before it will be held liable, as long as

4

there is a causal connection between the successor's acquisition and the unavailability of the predecessor as a potential defendant. (*Stewart v. Telex Communications, Inc.* (1991) 1 Cal.App.4th 190, 198–199 (*Stewart*); *Kaminski, supra*, 175 Cal.App.3d at p. 458.)

## II. Analysis of Asset Sale to New NCRS

The summary judgment evidence shows that after NCRS sold its principal assets to New NCRS in 1995, NCRS continued to exist as a legal entity under a different name until it merged with General Motors in 1996. Thus, the asset sale did not destroy or diminish Hernandez's remedies against NCRS. If NCRS was strictly liable for the allegedly defective 1992 Oldsmobile, that liability was assumed by General Motors, not by New NCRS.

Evidence establishing these facts includes documents pertaining to the 1995 sale of the assets of NCRS to New NCRS, which were produced during a demurrer proceeding and are included in Appellant's Appendix.[1] Excerpts from a Form 10-K/A and a Form 8-K that General Motors filed with the Securities and Exchange Commission (SEC) describe a sale of substantially all of the operating assets of its subsidiary NCRS, a transfer of "certain liabilities" to the entity that later became New NCRS, and the retention of responsibility by General Motors for the sale and liquidation of NCRS's remaining assets and considerable liabilities that were not sold to New NCRS. The record also documents the name change of NCRS and its merger into General Motors in 1996. In light of this evidence, Hernandez conceded during discovery and during the summary judgment proceeding that, after NCRS sold its car rental business and changed its name to GM National Holding Co., it merged with General Motors.

---

[1] Enterprise's motion for summary judgment states that the motion is based on "all of the pleadings, records, and files herein and on such other argument or documentary evidence as may be presented" at the summary judgment hearing. We assume this is why the Appellant's Appendix that Hernandez filed in this court includes evidence from the superior court record that pertains to the asset sales at issue in this appeal. (See Cal. Rules of Court, Rule 8.124(b)(3)(A) [The Appellant's Appendix "must not . . . [c]ontain documents . . . that are unnecessary for proper consideration of the issues."].)

As a result of this two-part transaction, well-settled principles of successor liability establish General Motors as the corporation that succeeds to NCRS's strict liability for defective products. General Motors succeeds to NCRS's liabilities because when a corporation merges with its subsidiary, the surviving corporation succeeds to the erstwhile subsidiary's liabilities, even if the operating assets of the subsidiary have been transferred elsewhere. (*Petrini v. Mohasco Corp*. (1996) 61 Cal.App.4th 1091, 1098 (*Petrini*).) For example, in *Petrini* defendant Mohasco Corporation owned a wholly-owned subsidiary that made floor tiles containing asbestos. (*Id*. at p. 1093.) Deciding to liquidate this subsidiary, Mohasco caused its floor tile business to be sold to unrelated third parties. (*Ibid*.) When little more than a corporate shell remained of the subsidiary, Mohasco merged with it, becoming responsible for its liabilities. (*Id*. at pp. 1093, 1098.) As our colleagues in Division Two explained, "The surviving corporation under a statutory merger is responsible for the liabilities of the merged corporation under both common law and statute," including liabilities unknown at the time of the merger such as Mr. Petrini's later-manifesting mesothelioma. (*Id*. at pp. 1098–1099.) Here, General Motors stands in the same position as did Mohasco; having sold off the operating business of its NCRS subsidiary and then merging with what remained of NCRS, General Motors succeeds to NCRS's liabilities, including any strict liability for Hernandez's accident.

Because General Motors succeeds to NCRS's liabilities, New NCRS does not. This is a straight-forward application of *Alad*, which requires, as its first condition for imposing successor liability on the purchaser of a product line, a "virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business." (*Alad*, *supra,* 19 Cal.3d at p. 31.) The first prong of the *Alad* test is not met here, where New NCRS's acquisition of the car rental business did nothing to destroy or impair plaintiff's remedies against the original NCRS. The transfer of assets to New NCRS did not prevent Hernandez from seeking recourse against General Motors, so *Alad*'s special rule for successor liability in product-line cases does not

6

impose liability on New NCRS. (See *Phillips*, *supra*, 215 Cal.App.3d 1648; *Kline v. Johns-Manville* (9th Cir. 1984) 745 F.2d 1217 (*Kline*).)

The facts of *Phillips* are somewhat convoluted but offer an instructive parallel. Ms. Phillips and her husband attempted to sue a company (Cooper Laboratories, Inc.) that succeeded to the liabilities of a company (SMP-NY) that had purchased, for adequate consideration, a fertility drug distribution business from E.S. Miller Laboratories, Inc. (Miller). (*Phillips*, *supra*, 215 Cal.App.3d at pp. 1652, 1655.) Miller and SMP-NY were both subsidiaries of Nestle, and after Miller sold the drug distribution business to SMP-NY, Miller continued as a profitable subsidiary, running warehouse operations for a decade until Nestle dissolved it. (*Id*. at p. 1658.) When plaintiffs sought to hold Cooper strictly liable for injuries allegedly suffered as a result of Ms. Phillips having ingested Miller's fertility drug, they failed. Cooper was not liable under *Alad* because the transfer of the drug distribution business from Miller to SMP-NY did not cause " 'the virtual destruction of the [Phillipses'] remedies against' " Miller. (*Id*. at p. 1657.) Miller had "continued as a separate viable corporate entity" and in the ensuing decade "was more profitable as a warehouse operation than it had been as a pharmaceutical operation." (*Id*. at p. 1658.) So, here, NCRS continued as a viable corporate entity after the sale of its car rental business, until its assets and liabilities were assumed by merger with General Motors. Nothing about the sale of its assets to New NCRS inhibited, let alone destroyed, Hernandez's remedies against NCRS, as she could have proceeded against NCRS or, after the merger, against General Motors for years after the sale to New NCRS.

Our dissenting colleague discounts evidence tracing successor liability for NCRS to General Motors, positing that corporate successorship liability may fall simultaneously on two companies if both have a sufficient relationship to the predecessor corporation. (Dissent, p. 17.) We think this theory is inconsistent with the first requirement of *Alad*, that one who buys the assets and continues the operations of a business will be strictly liable for previously-sold products only if the purchaser's acquisition effectively destroyed the plaintiff's remedies against the seller. (*Alad*, *supra,* 19 Cal.3d at pp. 30–31.) The evidence that General Motors's spin-off of NCRS's car rental business did not

7

impair Hernandez's remedies against NCRS is therefore dispositive of her effort to hold the unrelated acquiring company liable for her accident.

The *Kaminski* case on which the dissent relies is not to the contrary. The Kaminskis alleged injury as a result of asbestos supplied by, among others, a defunct corporation called Western Asbestos, and they sued in place of Western Asbestos a corporation named Western MacArthur that was carrying on Western Asbestos's business. (*Kaminski, supra*, 175 Cal.App.3d at pp. 451, 455.) *Kaminski* held that Western MacArthur was liable as a successor corporation because Western MacArthur's parent had used its "financial and managerial control" over Western Asbestos to "cause it to dissolve," thereby "extinguish[ing] the Kaminskis' remedies against Western [Asbestos]." (*Id*. at pp. 458–454.) These facts satisfied the "virtual destruction of plaintiff's remedies" prong of *Alad*, notwithstanding that the Kaminskis could (and did) also sue and settle with the other defendants who they alleged had manufactured or distributed asbestos that caused their harm. (*Id*. at pp. 450, 459.) "The presence of another legitimate target defendant" in a case alleging joint and several liability against multiple tortfeasors "does not defeat successor liability" under *Alad*, the *Kaminski* court held. (*Id*. at p. 459.) But *Kaminski* is distinguishable from Hernandez's case, where nobody relies on the existence of jointly and severally liable co-defendants to argue against successor liability for New NCRS. Here, unlike in *Kaminski*, the predecessor corporation did not dissolve but was merged into a successor, so that plaintiff's remedies against NCRS were not extinguished in the transaction.

Hernandez herself has never argued that NCRS transferred liability for the Oldsmobile to more than one entity. To the contrary, she insists that New NCRS *rather than General Motors* acquired NCRS's strict liability for defects in the 1992 Oldsmobile, but she makes this argument without relying on the *Alad* test. Instead, Hernandez argues that summary judgment should not have been granted because Enterprise failed to discredit theories of successor liability pleaded in her complaint, which relied on traditional exceptions to the general rule of successor non-liability.

8

The complaint alleges that Enterprise assumed strict liability for Hernandez's injuries because Enterprise "continued the business of NCRS," "merged with NCRS," and/or "assumed the liabilities of NCRS." These legal theories are not fleshed out by any allegations of material fact, however, and Hernandez has abandoned any allegation that Enterprise or New NCRS merged with NCRS. She argues on appeal that (1) New NCRS was a mere continuation of Old NCRS, and (2) New NCRS expressly assumed the liabilities of Old NCRS. We reject both arguments.

Hernandez's theory that New NCRS succeeded to NCRS's liabilities as a mere continuation of the prior company relies on the undisputed evidence that New NCRS continued to operate NCRS's rental car business after acquiring its assets. But more is required. To establish that an acquiring corporation is a mere continuation of the seller, a plaintiff must "demonstrate '(1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; [or] (2) one or more persons were officers directors, or stockholders of both corporations.' " (*CenterPoint Energy, Inc. v. Superior Court* (2007) 157 Cal.App.4th 1101, 1121.) "[E]ven when the same persons are officers or directors of the two corporations, liability is not imposed on the acquiring corporation when recourse to the debtor corporation is available and the two corporations have separate identities." (*Beatrice Co. v. State Bd. of Equalization* (1993) 6 Cal.4th 767, 778.)

Here, the record establishes that recourse to NCRS and then its merger partner remained available, and the selling and acquiring companies were separate entities. According to General Motors's and New NCRS's SEC filings, New NCRS paid approximately $1.5 billion to acquire the assets of NCRS, a sum much larger than the net liabilities NCRS retained. More importantly, General Motors became responsible for the assets and liabilities not sold to New NCRS, and then merged with NCRS after the sale. Hernandez has neither alleged facts in her complaint nor introduced evidence in opposition to the motion for summary judgment that would create an issue of material fact as to either the corporate separateness of NCRS and New NCRS, or the adequacy of

the resources available for meeting claims against NCRS after the sale of its operating assets to New NCRS.

As for Hernandez's theory of express assumption, she has admitted in an interrogatory response that she does not have documentary evidence that New NCRS expressly assumed liability from NCRS for accidents such as hers. The same interrogatory response baldly asserts, without support or explanation, that Enterprise does have such documents, but the response goes on to admit that Hernandez sought the documents in discovery without success. For good measure, counsel for Enterprise represented to this Court at oral argument that his client does not have the transaction documents that show what liabilities New NCRS acquired along with the assets it purchased from NCRS. Hernandez's unsupported allegation that Enterprise has evidence that it insists it does not have does not detract from the force of her admission that, after pursuing relevant discovery, she still lacks evidence to establish that New NCRS expressly assumed NCRS's liability for this accident. A defendant satisfies its summary judgment burden by producing evidence of this kind of admission. (*Aguilar, supra*, 25 Cal.4th at p. 855.)

Enterprise having carried its initial burden of producing evidence that New NCRS did not assume the liabilities of NCRS after it acquired the rental car business, the burden shifted to Hernandez to show a triable issue of material fact regarding the alleged successor liability of New NCRS. (*Aguilar*, *supra*, 25 Cal.4th at p. 853.) She did not carry that burden. This failure alone justifies affirming the trial court's grant of summary judgment, but we nevertheless turn to the second part of Hernandez's successor liability theory, purporting to trace strict liability from New NCRS to Enterprise.

## III. Analysis of Cerberus's Purchase Out of Bankruptcy Estate

The summary judgment evidence shows that New NCRS went into bankruptcy in 2001 and that the Cerberus entities purchased assets from the New NCRS bankruptcy estate in 2003 pursuant to an agreement that was approved by the bankruptcy court. This evidence supports Enterprise's argument that it did not assume the alleged strict liability of New NCRS for a product defect in the 1992 Oldsmobile by acquiring the rental car

10

business from New NCRS.  If Hernandez's remedies against New NCRS were destroyed, that destruction was not caused by Cerberus's acquisition of the assets, but by the fact that New NCRS went into bankruptcy.  (See *Stewart, supra,* 1 Cal.App.4th at pp. 196–200 [first element of *Alad* missing where successor corporation buys assets out of bankruptcy estate]; *Nelson v. Tiffany Industries, Inc.* (9th Cir. 1985) 778 F.2d 533, 537–538 [same]; *Kline, supra,* 745 F.2d at pp. 1219–1220 [*Alad* test not satisfied when asset sale was unrelated to subsequent bankruptcy].)

The *Stewart* case illustrates the significance of a predecessor company's bankruptcy for successor liability under *Alad*.  Stewart was horribly burned while installing an allegedly defective antenna manufactured, designed, and distributed by a company called Hy-Gain Electronics Corp. (Hy-Gain).  (*Stewart*, *supra*, 1 Cal.App.4th at pp. 192–193.)  By the time of the accident, Hy-Gain "had long since declared bankruptcy and gone out of business."  (*Id*. at p. 192.)  The bankruptcy trustee had sold essentially all of Hy-Gain's assets—manufacturing facilities and equipment, inventory, designs, blueprints, patents, trademarks, customer lists, sales orders, and so on—to defendant Telex Communication's Inc. (Telex), which then continued to operate the antenna business and to sell the same model of antenna under the same trade name as the antenna that later injured Stewart.  (*Id*. at pp. 193–195.)  The *Stewart* court recognized that "the sole distinction between *Alad* and the present case is that 'Telex purchased Hy-Gain assets through the intermediary of the bankruptcy courts[] rather than directly,' " but it nonetheless held that Telex was not liable as Hy-Gain's successor.  (*Id*. at pp. 196, 200.)  It explained that without some showing that Telex played a role in causing the voluntary bankruptcy of Hy-Gain, or that the bankruptcy "was a mere subterfuge to avoid the holding of *Alad*,[] summary judgment was properly granted, as the *Alad* exception was inapplicable to Telex."  (*Id.* at p. 200.)

Here, New NCRS's bankruptcy preceded by two years the sale of assets to the Cerberus entities, and there is no evidence that any successor to New NCRS's business line played a role in curtailing or destroying Hernandez's remedies against New NCRS. (Compare *Kaminski, supra*, 175 Cal.App.3d 445.)  Thus, under the well-established rule

11

of *Stewart*, the *Alad* exception to the general rule against successor liability does not apply to the transfer of assets from New NCRS to Cerberus.

Hernandez contends there is a triable issue of material fact regarding the successor liability of Cerberus because, when the Cerberus entities purchased New NCRS's assets in 2003, they expressly assumed liability for product defects in the 1992 Oldsmobile and for accidents involving that vehicle.

The record contains a copy of a 2003 Asset Purchase Agreement (APA) pursuant to which ANC Rental Corporation and its subsidiaries including New NCRS, collectively referred to as debtors, sold assets relating to their operation of multiple car rental businesses to a group of sellers that included Cerberus. The parties agree that this APA was the agreement that accomplished the transfer of assets from the New NCRS bankruptcy estate to the Cerberus affiliates.

Article II of the APA, which is titled "PURCHASE AND SALE OF ACQUIRED ASSETS," is divided into several sections. Section 2.1 contains a broad definition of acquired assets, covering all of the sellers' rights in their business, properties, and assets. A non-exclusive list of said assets includes "all vehicles . . . owned by any Debtor used in the Business." Section 2.2, titled "Excluded Assets," lists assets of the debtors that are not included in the definition of Acquired Assets and are not part of the sale. This list of excluded assets states that the equity securities of specific subsidiaries including New NCRS are not acquired assets within the meaning of the APA. Section 2.3, which is titled "Assumed Liabilities," contains a list of specific liabilities that the purchasers agree to assume from the seller entities (including New NCRS). Hernandez contends that two provisions in section 2.3 establish that Cerberus expressly assumed liability for a product defect in the 1992 Oldsmobile that later came to be involved in her accident.

First, Hernandez contends the Cerberus purchasers are liable to her under section 2.3(d) of the APA, which provides that the purchasers will assume liabilities "relating to or incurred in connection with the Acquired Assets . . . that arise after the Closing Date." She reasons that (1) "Acquired Assets" included the rental car company assets of New NCRS, and (2) liability for her accident was incurred after the closing date of the

12

agreement. However, the undisputed evidence shows that NCRS sold the 1992 Oldsmobile in 1993. Thus, this vehicle was not an asset of New NCRS in 2003 and therefore not an "Acquired Asset" of the purchasers under the terms of the APA. Applying the APA's definition of "Acquired Asset," the Oldsmobile was not a vehicle "owned by any Debtor" involved in the transaction. Moreover, the summary judgment evidence shows that New NCRS, the bankrupt corporation, was not acquired *in toto* by Cerberus, even if its assets were. This means that Cerberus never acquired any asset— neither the car nor the corporation—to which liability for Hernandez's future accident could have attached.

Second, Hernandez relies on section 2.3(g), pursuant to which the purchasers assumed the following liabilities: "(g) Liabilities (except for vicarious Pre-Petition Liabilities arising from pre-petition auto accidents) relating to accidents involving the vehicles of the Business . . . (i) reflected on or of a category reserved against on the March 31, 2003 consolidated balance sheet of Seller and outstanding on the Closing Date or (ii) incurred in the Ordinary Course of Business after March 31, 2003."

The Oldsmobile was not a "vehicle of the Business" when the Cerberus transaction took place, in that NCRS had a decade earlier sold the Oldsmobile to a private party. Hernandez contends that section 2.3(g) necessarily applies to vehicles that were formerly used by NCRS, the predecessor to the bankrupt seller here. We disagree. The contract language unambiguously limits assumed liabilities to "the vehicles of the Business," and it defines "Business" as "car rental businesses" licensed and operated under brand names including National. We find no basis for extending this language to include vehicles previously owned by such businesses. The Oldsmobile was a vehicle of NCRS for less than a year before it was sold to the S. family in 1993. This vehicle was not transferred to New NCRS when New NCRS purchased the assets of NCRS in 1995. Thus, the Oldsmobile was never a vehicle of the business of New NCRS, and not a vehicle of any relevant business when the Cerberus transaction occurred in 2003. We reject Hernandez's argument that there is any absurdity in construing section 2.3(g) in this manner. The APA was dated as of June 12, 2003 and section 2.3(g) addresses

13

covered accidents before and after the close of the previous quarter. In section 2.3(g), Cerberus assumes liability for accidents "incurred in the Ordinary Course of Business after" the close of the previous quarter but only for "vehicles of the Business," and nothing in this provision sweeps in liability for vehicles never owned by New NCRS at all.

Finally, Hernandez contends that even if Cerberus did not expressly assume liability for alleged defects in the Oldsmobile, as a matter of law the sale of assets from the bankruptcy estate of New NCRS did not eliminate successor liability based upon claims that had not arisen at the time of the sale. Hernandez's only authority for this proposition is *Elliott v. GM LLC (In re Motors Liquidation Co.)* (2nd. Cir. 2016) 829 F.3d 135 (*Elliott*), which is inapposite. That case involved the Chapter 11 bankruptcy of General Motors pursuant to which "Old GM used 11 U.S.C. § 363 of the Bankruptcy Code . . . to sell its assets to New GM 'free and clear.' " (*Id*. at p. 143.) The question presented was whether New GM could "use the Sale Order's 'free and clear' provision to shield itself from claims primarily arising out of" a product defect that General Motors knew (or should have known) about, but had not disclosed by the time of the bankruptcy. (*Id*. at pp. 152, 159.) In circumstances not relevant here, the Second Circuit concluded that the answer to this question is yes. (*Id*. at p. 156.) But in reaching this conclusion it also considered the circumstance of a hypothetical future tort claimant whose claim, although resulting from the debtor's pre-petition conduct, does not accrue until a post-petition accident occurs. (*Ibid*.) The claims of these individuals (like Hernandez) will not be subject to the jurisdiction of the bankruptcy court because they are still "completely unknown and unidentified at the time" of the bankruptcy. (*Ibid*.)

There is no dispute in this case that Hernandez did not have a claim against New NCRS that the bankruptcy court could have discharged. After all, her accident had not occurred when New NCRS filed its Chapter 11 petition. But this limitation on the reach of federal bankruptcy law in no way detracts from the state-law rule, articulated in *Stewart* and applied in both state and federal cases as a matter of California law, that absent unusual circumstances not present here, successor liability under *Alad* will not

14

reach a successor who purchases assets out of a bankruptcy estate. (See *Stewart*, *supra*, 1 Cal.App.4th at p. 200; *Nelson v. Tiffany Industries, supra,* 778 F.2d at p. 537 ["it was Moody's bankruptcy and not Tiffany's subsequent purchase of the assets that destroyed Nelson's remedies"]; see also *Schuman v. Varn Internat., Inc.* (W.D.Wash. Sep. 10, 2012, No. C10-980-RSM) 2012 U.S.Dist.LEXIS 129221, at p. *9 [collecting authority].) These cases turn on whether the successor corporation caused the financial difficulties that led the predecessor to be unavailable to cover liabilities to future tort victims, not on the scope or specifics of federal bankruptcy law. The portions of *Elliott* on which Hernandez relies address a different question not relevant here: whether a bankruptcy court's order has the power to extinguish such claims. (*Elliott, supra*, 829 F.3d at p. 152; see also *Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus.)* (S.D.N.Y. 2012) 467 B.R. 694, 702 [distinguishing the question whether "there is a viable basis for state successor liability based on prepetition conduct of the debtor" from the question whether "a bankruptcy court's sale order may be enforced to extinguish those claims where no injury occurred to the claimant until after the bankruptcy closed"].) Enterprise does not rely on the terms of the bankruptcy court's sale order in this case, but on the fact that New NCRS went into bankruptcy in the first place. Thus *Stewart*, rather than *Elliott*, provides the rule of decision.

In sum, the record evidence establishes as a matter of law that, for two independent reasons, Enterprise did not succeed to any liability NCRS would have had for Hernandez's injuries. First, New NCRS did not succeed to NCRS's liability because after the sale of NCRS's assets plaintiffs such as Hernandez could have sought recourse against General Motors. Second, even if New NCRS would have been liable to Hernandez, no such liability carries through to Cerberus and Enterprise after New NCRS entered bankruptcy through no fault of the acquiring entities. Because they did not cause New NCRS's bankruptcy, Cerberus and Enterprise do not come within *Alad*'s exception to the general rule against successor liability in an asset sale. No triable issue of material fact regarding Hernandez's theory of successor liability remains, and the trial court did not err in granting summary judgment.

15

## DISPOSITION

The judgment is affirmed. Costs are awarded to respondent.

 

 

_____
TUCHER, J.


I CONCUR:




_____
BROWN, J.

**Dissenting Opinion of Streeter, Acting P. J.**

**Streeter, Acting P.J.,** Dissenting.—At 11 years old, plaintiff Janine Hernandez suffered grievous injuries when the car in which she was riding, a 1992 Oldsmobile driven by her sister, was involved in a head-on collision. She survived, but as a paraplegic. She tried to sue various defendants based on a defective design theory, including General Motors Corporation (GM), the manufacturer of the 1992 Oldsmobile, but her lawsuit against GM was stayed when GM went bankrupt. This action is an attempt to hold Enterprise Rent-A-Car and its affiliates (Enterprise) liable as the corporate successor to the National Car Rental System Inc. (NCRS), the original lessor and seller of the car. I believe she is entitled to a trial. On both of the questions before us—strict liability, and corporate successor liability—I conclude that Enterprise failed to carry its burden as a summary judgment movant.

## I.      STRICT LIABILITY

If there was ever a textbook case in which the risk-spreading principles of strict liability under *Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 (*Greenman*) and *Vandermark v. Ford Motor Co.* (1964) 61 Cal.2d 256 (*Vandermark*) should apply, this is it. The trial court took the view that under *Price v. Shell Oil Co.* (1970) 2 Cal.3d 245 (*Price*), strict liability applies to car rental companies only during the period when they lease a car to the public, and that upon selling a car after retiring it as a rental, they get the protection of the rule that sellers of used goods are not subject to strict liability. (*Tauber-Arons Auctioneers Co. v. Superior Court* (1980) 101 Cal.App.3d 268 (*Tauber-Arons*); see also *LaRosa v. Superior Court* (1981) 122 Cal.App.3d 741 (*LaRosa*); *Wilkinson v. Hicks* (1981) 126 Cal.App.3d 515 (*Wilkinson*).) I believe this was error, and that we should say so.

At issue in *Price* was a truck leased by Shell Oil Company (Shell) to an airplane service company, Flying Tiger Line, Inc. (Flying Tiger). (*Price*, *supra*, 2 Cal.3d at p. 248.) The plaintiff, a mechanic employed by Flying Tiger, was injured while using the leased truck. The *Price* court held that Shell could be held strictly liable, and that the form of the transaction by which the truck reached Flying Tiger—lease, rather than

43

sale—was of no moment.  What mattered, the court held, was not the transactional form of distribution, but rather that Shell was "in the business of leasing" trucks on a "mass" scale, as distinguished from having engaged in a one-off, "isolated or occasional transaction."  (*Id.* at pp. 254–255.)  The trial court thought applying *Price* would require it to "extend" this holding, but I think that misreads the case.  Nothing in *Price* suggests that it applies only during the term of a leased vehicle.  In fact, that idea is contrary to the emphasis the *Price* court placed on looking past the form of the transaction by which a product is offered to the public.  (*Id.* at pp. 249–255.)

Price represented a key step in the gradual expansion of the stream of commerce theory of strict liability first enunciated in *Greenman* and *Vandermark*.  The basis of that theory, of course—a common law innovation that has had reverberations nationwide—is that the risk of injury caused by consumer goods should be allocated to those who are best positioned to take action to minimize the risk of future injury.  By passing goods along the chain of distribution that ultimately reaches the consumer, any business within the chain is deemed to be "an integral part of the overall producing and marketing enterprise" and may be held accountable for "the cost of injuries resulting from defective products[.]"  (*Vandermark*, *supra*, 61 Cal.2d at p. 262.)  Recognizing the reality that vehicle leasing often goes hand-in-hand with vehicle sales in a marketing enterprise, *Price* relied on a vehicle leasing case from New Jersey, *Cintrone v. Hertz Truck Leasing Etc.* (1965) 45 N.J. 434, 440 [212 A.2d 769] (*Cintrone*).  The defendant in *Cintrone*, "Hertz Truck Leasing & Rental Service[,] [was] in the business of leasing and renting various types of motor vehicles to the public."  (212 A.2d at p. 772.)  Hertz, as a lessor, was held to be strictly liable in tort to the employee of a customer who rented one of its trucks.  (*Id.* at pp. 771, 778–779.)

The *Price* court anchored its holding in the "broad philosophy" of strict liability, animated by the overall "purpose of . . . 'insur[ing] that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves.' "  (*Price*, *supra*, 2 Cal.3d at p. 251.)  "[T]he paramount policy to be promoted" by the rule

44

of strict liability, the court explained, "is the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them." (*Ibid.*)

With that as the doctrinal backdrop, the *Price* court discussed *Cintrone* at length, observing that a large scale vehicle leasing business puts " 'vehicles in the stream of commerce in a fashion not unlike a manufacturer or retailer,' subjects such a leased vehicle 'to more sustained use on the highways than most ordinary car purchasers,' and by the very nature of [its] business, exposes 'the bailee, his employees, passengers and the traveling public to a greater *quantum* of potential danger of harm from defective vehicles than usually arises out of sales by the manufacturer.' " (*Price*, *supra*, 2 Cal.3d at p. 252.) "In today's society," the court concluded, "with 'the growth of the business of renting motor vehicles, trucks and pleasure cars' . . . and the persistent advertising efforts to put one 'in the driver's seat' . . . we have no difficulty in finding the doctrine [of strict liability] peculiarly applicable to the lessor of motor vehicles." (*Id*. at p. 253.)

Applying *Price* to this case, the fact that the specific transaction at issue here was a sale—at the end of the 1992 Oldsmobile's one-year tour of duty as a rental car in February 1993—is of no consequence. Central to the holding in *Price* is that the difference between leasing and selling does not matter. When analyzing the stream of commerce under *Greenman* and *Vandermark*, either mode of doing business may lead to strict liability since they are both means for introducing products into the marketplace. What is key is not the form of distribution, but whether a lessor may be said to have had a "participatory connection, for [its own] profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product." (*Kasel v. Remington Arms Co.* (1972) 24 Cal.App.3d 711, 725.)

In my view, there is such a "participatory connection" here. The key insight *Price* draws from *Cintrone* is that the motor vehicle leasing business and the motor vehicle manufacturing business, in modern commerce, are financially interdependent. Car rental companies promote car manufacturers' cars to the driving public—allowing rental customers, in effect, to test drive the cars for extended periods—and, in return, rental car

45

companies benefit from the brand value of manufacturers in attracting potential rental customers. That is enough to put Enterprise in the stream of commerce between GM and the plaintiff in this case. No de facto distributorship or sales agency is required. Nor is de facto manufacturing status required.

Thus, I think the trial court was incorrect to conclude that, to apply strict liability here, it would have to "extend" *Price*. Our Supreme Court has already resolved the issue presented here—in *Price* itself, by embracing *Cintrone*. This case is controlled by *Price* as a matter of law, and even if there were some arguable factual question about whether *Price* applies because we do not know what, exactly, Old NCRS's relationship with GM was, I think that on this record, the business reality is plain enough. After all, before Old NCRS's later incarnation as New NCRS in its mid-1990s corporate history, GM saw the National Car Rental business which both Old NCRS and New NCRS operated as sufficiently integral to its manufacturing and marketing enterprise to own it as a subsidiary. As evidence of the business realities in this case, Old NCRS's status as a GM operating subsidiary speaks volumes.

The only extension of doctrine in play here is the legal position Enterprise argues in reliance on *Tauber-Arons*, *LaRosa*, and *Wilkinson*. According to Enterprise, the sale of the 1992 Oldsmobile in 1993 triggers the rule under these cases that the seller of used machinery is not strictly liable in tort unless it rebuilds or reconditions the product and thus assumes a role analogous to that of a manufacturer. Whatever utility *Tauber-Arons*, *LaRosa*, and *Wilkinson* may have in promoting traditional modes of distribution for second-hand goods through flea markets, consignment sales and auction houses, I think it is unwise to apply those cases too broadly. They should be limited to situations in which the product in question passes to the consumer (whatever the form of the transaction) from some source outside of the marketing enterprise, as broadly defined in *Kasel*. (*Kasel*, *supra*, 24 Cal.App.3d at p. 725.)

In today's sharing economy, where many new forms of short-term rental relationships are proliferating in the consumer marketplace, and the Internet has disrupted quaint notions of tiered distribution from manufacturer to consumer, it is, in my view,

unwise to read *Price* narrowly while giving an unduly broad reading to *Tauber-Arons* and its progeny. The used goods cases reflect an economic reality about the consumer marketplace that is rapidly disappearing. Ultimately, the teaching of *Greenman* and *Vandermark*—some might say the genius of those Traynor-era cases—is that they instruct us as a common law court to adapt the law of torts to society's current economic realities.

## II. CORPORATE SUCCESSOR LIABILITY

The primary ground of the trial court's grant of summary judgment, and the focus of almost all of its attention in its summary judgment order, was that the doctrine of strict liability does not apply. But at the end of its summary judgment order, the court briefly discussed and embraced Enterprise's backup argument that, on this summary judgment record, it has no liability as a corporate successor to NCRS. Without reaching strict liability, the majority affirms on this alternative ground. I respectfully disagree and would reverse on the issue of successor liability as well.

My colleagues and I start from the same well-established premises. Under traditional principles of corporate successorship liability, the general rule is that a successor by asset purchase does not assume the selling corporation's debts and liabilities. (*Ray v. Alad Corp.* (1977) 19 Cal.3d 22, 28 (*Alad*).) But there are five exceptions to this general rule, and where we part ways is in whether any of those exceptions applies. I think at least two of them do, including one that is specifically designed for strict liability cases.

Successor liability attaches where "(1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." (*Alad*, *supra*, 19 Cal.3d at p. 28.) Our Supreme Court created a fifth, public-policy based exception known as the product line successor rule, tailored specifically to products liability cases. (See *Kaminski v. Western MacArthur Co.* (1985) 175 Cal.App.3d 445, 456 (*Kaminski*) ["Given the policies underlying strict liability, the

47

'stream of commerce' approach to liability should extend to successor entities. When a distributor or retailer acquires a corporation and takes advantage of its goodwill and other corporate assets and facilities to inject the predecessor's product line into the stream of commerce, it continues 'the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products.' "].)

The "[j]ustification for imposing strict liability upon a *successor* to a manufacturer under the circumstances here presented rests upon (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business." (*Alad*, *supra*, 19 Cal.3d at p. 31.)

At issue here are the first exception to the general rule of corporate successor nonliability (express assumption by agreement) and the fifth exception (product line liability under *Alad*). "To establish that it [was] entitled to summary judgment," Enterprise had the burden of showing that these two "exceptions . . . do not apply in this case. Those issues are 'extremely fact sensitive.' " (*Fisher v. Allis-Chalmers Corp. Product Liability Trust* (2002) 95 Cal.App.4th 1182, 1188.) "Eliminating the exceptions require[d]" Enterprise to "disprov[e] at least one element of each exception or show[] that at least one such element cannot be established." (*Ibid.*) Enterprise's summary judgment motion in this case sought to carry that burden by breaking the chain of successor liability at two points in the corporate history of NCRS.

First, Enterprise argued, plaintiff cannot trace the liability beyond 1996, when GM National Holding Co. (formerly Old NCRS) was merged into GM. Second, Enterprise argued, plaintiff cannot trace successor liability past the purchase by Cerberus Capital Management, L.P. (Cerberus) of the New NCRS assets out of bankruptcy in 2003. The trial court held that plaintiff could not clear either hurdle. Adopting Enterprise's reasoning, the court explained, "the string of liability would have been broken [in 2003]

48

when NEW NCRS (assuming it [was] a successor to the liability of OLD NCRS, which itself is debatable) went into bankruptcy and its assets were purchased by CERBERUS MANAGEMENT pursuant to an 'Asset Purchase Agreement' in which Cerberus Management did not assume liabilities such as the strict liability for the automobile at issue in this case." Then, without discussion, the court briefly concluded if "OLD NCRS remained liable into the future, [its] liability would have been assumed by GM in OLD NCRS's merger with GM in 1996."

Both grounds for granting summary judgment on successor liability are erroneous, in my view.

### A. Express Assumption

#### 1. *Contract Excerpts in the Summary Judgment Record*

The summary judgment record addressing express assumption is not a model of clarity. In its statement of undisputed facts,[1] Enterprise supported its summary judgment motion with bits and pieces of the June 12, 2003 "Asset Purchase Agreement by and among ANC Rental Corporation, and the Other Debtors Listed on Signature Pages Hereof, debtors-in-possession, and Car Acquisition Company LLC and Cerberus Capital Management, L.P." Only a handful of pages from this contractual instrument are in the summary judgment record, but based on what can be seen from the few pages Enterprise provided, it is a lengthy, complex document. These excerpts—which include the caption page, some recitals, a signature page, and two of the document's many schedules— include only two pages of actual contract language. They span pages 26 and 27 of the contract and appear to include the entirety of section 2.3, which is entitled "Assumed Liabilities." In the briefs, the parties argue back and forth about whether, under section

---

[1] See *United Community Church v. Garcin* (1991) 231 Cal.App.3d 327, 337 (the "Golden Rule" of summary judgment and summary adjudication is that "if it is not set forth in the separate statement, *it does not exist*' ").

49

2.3(d), or under section 2.3(g), Enterprise expressly assumed the potential liabilities at issue in this case.

Under section 2.3(d), Enterprise assumed "[l]iabilities relating to or incurred in connection with the Acquired Assets . . . that arise after the Closing Date."  And under section 2.3(g), Enterprise assumed "[l]iabilities . . . relating to accidents involving the vehicles of the Business and the ALM Business[2] (i) reflected on or of a category reserved against on the March 31, 2003 consolidated balance sheet of Seller and outstanding on the Closing Date or (ii) incurred in the Ordinary Course of Business after March 31, 2003."  Based on these contract fragments from the summary judgment record, the majority opinion takes Enterprise's side of this debate, concluding, in essence, that it is impossible that the potential liability involved in this case could have been expressly assumed, because, by 2003—a decade after NCRS sold the 1992 Oldsmobile to the S. family—the allegedly defective car at issue in this case could not have been an "Acquired Asset" within the meaning of section 2.3(d), and could not have been a "vehicle of the Business" under section 2.3(g).  (Maj. opn., *ante*, at p. 13)

I do not think there is enough here to draw that conclusion.  To begin with, and most basically, a corporate asset purchase of the kind we have here typically includes far more than simply the purchase of personalty.  It may, and usually does, include the transfer of cash, real estate, goodwill, and intellectual property, including trademarks and other repositories of intangible brand value.  There are many reasons this form of acquisition is used as a mode of acquisition, but one of the most common is that it allows a line of business comprising something less than an entire corporate entity to be transferred (which explains why its distinguishing feature is that of a sale of assets rather than a sale of stock). Why is this basic corporate mergers and acquisitions concept important here?  Because the premise of the majority is that, if the *specific car* at issue in

---

[2] "ALM Business" was defined as "the car rental business previously operated by Spirit Rent-A-Car, Inc. and its predecessors in the car replacement market throughout the United States under one or more of the brand names 'Spirit', 'CarTemps USA' or 'Alamo Local'."  (Asset Purchase Agreement § 1.1.)

this case was no longer owned by NCRS as of 2003, liability for an accident caused by a car it sold many years before—having been out of its ownership and control for more than a decade—could not have been assumed by Enterprise.

Maybe that premise is right, or maybe it is wrong. But it is a problem of legacy tort liability that is well known in the business world, especially among businesses that operate over the course of many decades. Here, the question of express assumption depends on the meaning of the terms "Acquired Assets" (§ 2.3(d)) and "Business" (§ 2.3(g)). If Cerberus's objective was to buy *a line of business*, including goodwill built up over many years and the "National Car Rental" brand value, then, depending on what exactly was negotiated in the bankruptcy proceedings, the purchase could easily have included liabilities relating to formerly owned assets. The scope of the purchase may have included all of the legacy liability, some of it, or none of it, but obviously the extent to which those liabilities were taken on board would have fundamentally affected the price and hence the amount of money received by the bankruptcy estate. All of which is to say that this kind of issue can be, and often is, a focal point of negotiation in bankruptcy, and as a result, it is not something we can safely make assumptions about when all we have in the summary judgment record is a few pieces of the Asset Purchase Agreement.

The majority opinion nevertheless reasons that section 2.3 "contains a list of specific liabilities that the purchasers agreed to assume from the seller entities" and that the 1992 Oldsmobile "was not an asset of New NCRS in 2003 and therefore not an 'Acquired Asset' of the purchasers under the terms" of the Asset Purchase Agreement. (Maj. opn., *ante*, at pp. 12–13.) The majority also concludes that "Cerberus never acquired any asset—neither the car nor the corporation—to which liability for [plaintiff's] future accident could have attached." (Maj. opn., *ante*, at p. 13.) I find these conclusions mystifying. We would never decide a contract interpretation issue in a breach of contract case—as a matter of law, especially in a case involving a complex contract—based on a record this scanty. Given the paucity of contractual materials in the summary judgment record here, I come to the opposite conclusion on each point. There

51

is no list of specific assets in section 2.3, and there is no reference to formerly owned vehicles, one way or the other.

Because the most pertinent wording in section 2.3 is broad and general (e.g., "Acquired Assets," "Business"), and because those words are defined elsewhere in sections of the contract that were not made part of the summary judgment record, it is difficult to know the scope of the asset purchase based solely on the contractual language Enterprise selectively chose to present. If, as appears to be the case, this was a purchase of a line of business, and *not* a purchase of a discrete list of assets—say, a fleet of 5,245 specific automobiles with listed ownership registration numbers—then I would expect to see provisions elsewhere in the contract that shed light on whether the contracting parties addressed or contemplated the potential of legacy tort liability associated with that line of business. Strangely, however, the summary judgment record does not include enough of the Asset Purchase Agreement to discern whether the parties addressed that issue. At best for Enterprise, in my view, the pieces of the Asset Purchase Agreement cited in the statement of undisputed facts are ambiguous.

Perhaps the record Enterprise relies upon would be sufficient under a summary judgment regime that only requires a movant to "point out" that a plaintiff cannot produce evidence raising a triable issue on some element of his or her claim. But of course under California rules of summary judgment procedure, more is required. A moving defendant bears "an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*); see *id*. at p. 854 ["Summary judgment law in this state . . . continues to require a defendant moving for summary judgment to present evidence, and not simply point out that the plaintiff does not possess, and cannot reasonably obtain, needed evidence."].) Under *Aguilar*, I would hold that Enterprise has failed to bear its initial burden of producing evidence negating any triable issue on successor liability, and reverse on that basis, without going further.

2.      *The More Complete Version of the Contract*

Unmentioned by the majority is a more fulsome version of the Asset Purchase Agreement that is included as part of appellant's appendix. Though not specifically included in the statement of undisputed facts that makes up the summary judgment record, this version of the Asset Purchase Agreement was placed before the court in connection with two earlier attempts to obtain a case-dispositive ruling on successor liability, once by Enterprise, and once by a co-defendant, AutoNation, in support of unsuccessful demurrers decided by different trial judges than the judge who granted summary judgment. Notably, it is still not a fully complete copy of the Asset Purchase Agreement, since it fails to include numerous schedules and exhibits, but it certainly sets forth the terms of ANC's asset sale to Cerberus in far greater detail than the bits and pieces of the contract cited by Enterprise in its statement of undisputed facts. This more complete version of the Asset Purchase Agreement fortifies my view that, at best for Enterprise, the governing contractual language is ambiguous with respect to whether there was an express assumption of the class of potential tort liability at issue in this case.

First, textually—when the fuller context of the defined terms is taken into account—I think a reading of the Asset Purchase Agreement favoring plaintiff's view that there was an express assumption is not only plausible, but is the more reasonable reading of it. The defined term "Acquired Assets" confirms that this was a sale of a line of business. As defined, the term means that Cerberus would "purchase, acquire and accept . . . all of [Debtors'] business, properties, assets, goodwill, contracts, rights and claims of whatever kind or nature, real or personal, tangible or intangible, whether known or unknown, actual or contingent, wherever located, other than the Excluded Assets." The defined term "Business" confirms that as well. As defined, "Business" means "car rental businesses in the airport and off-airport leisure and business travel rental markets" operated in various parts of the world "under the brand names Alamo, National and Guy

53

Salmon[.]" Thus, what was acquired here was a collection of lines of car rental businesses, including one operated under the brand name "National."[3]

Second, based on the structure of the Asset Purchase Agreement, it is clear the parties recognized there was a wide range of legacy liabilities associated with the "Acquired Assets" and the past conduct of the "Business," presenting contingent risk going forward, after the closing date of the sale. These contingent risks are all dealt with in the same general way: Cerberus, having been given a full opportunity to conduct a due diligence investigation of the businesses being acquired,[4] accepted representations and warranties from the sellers that (1) other than existing claims against them—which were fully disclosed and reflected in current liabilities on the sellers' balance sheets—they knew of no potential or contingent liabilities that could have a material adverse effect on the value of the businesses being acquired,[5] and (2) the sellers had in place, and were transferring to Cerberus, insurance and accounting reserves adequate to deal with unknown, contingent liability.[6]

This is a standard way of dealing with contingent liabilities in a corporate acquisition, but it was not Cerberus's only protection. For any categories of risk Cerberus was particularly concerned about, it was able to, and it did, put such exposures

---

[3] One of the additional pieces of information that can be gleaned from the more complete version of the Asset Purchase Agreement is a list of companies—including NCRS—whose stock was not included in the definition of "Acquired Assets." (Asset Purchase Agreement schedule 2.2(a) [Equity Securities not Included in Acquired Assets].)

[4] Asset Purchase Agreement sections 4.7 (Information), 5.2 (Access to Information; Cooperation; Confidentiality).

[5] Asset Purchase Agreement sections 3.10(a) (Litigation), 3.13(e) (Employee Benefit Matters), 3.14(a) (Labor Relations and Employment), 3.15(f) (Environmental Matters), 3.16(b) (Intellectual Property).

[6] Asset Purchase Agreement sections 3.26 (Insurance), 3.5(d) (contingent liabilities either disclosed or adequately reserved against), 6.2(a) (truth of all representations and warranties qualified by material adverse effect threshold).

54

on a list of "Excluded Liabilities."[7]  Included on this list, for example, were certain kinds of employment claims, contractual commitments under contracts that were not being transferred, tax liabilities beyond those reflected in the audited financial statements being relied upon at the time of closing, and liens on Acquired Assets other than the ones specifically disclosed and permitted.  Contingent environmental liabilities, the only form of strict liability specifically identified in the Asset Purchase Agreement—which is, of course, imposed by statute as a matter of public policy—is *not* on the list of "Excluded Liabilities."  Legacy risk for strict liability claims arising from past operation of the acquired "Business" is not on the list of Excluded Liabilities either.

Reading the Asset Purchase Agreement as a whole, I conclude it is at least a reasonable construction, possibly a compelled construction as a matter of law, that there was an express assumption of the class of tort liabilities we are dealing with here.  Nothing in the trial court's summary judgment order indicates that it considered the actual wording of the Asset Purchase Agreement.  Based on some fragments of the contract language, the majority affirms, accepting Enterprise's argument that, since NCRS sold the 1992 Oldsmobile at issue here a decade before the asset sale to Cerberus in bankruptcy—thus showing that the car was not a "vehicle of the business" at the time of the asset purchase—it was impossible for any liability on plaintiff's yet-to-be-asserted claim to be expressly assumed.  (Maj. opn., *ante*, at pp. 12–13.)  This reading of the Asset Purchase Agreement is flawed.[8]  It rests on a mistaken understanding of how contingent

---

[7]  Asset Purchase Agreement section 2.4 (Excluded Liabilities).

[8]  As just one example of how, textually, that interpretation is problematic, the Asset Purchase Agreement defines the term "Existing Vehicles" to have a literal meaning specific to autos currently owned, since it requires disclosure of detailed identifying information for each one.  (Asset Purchase Agreement § 3.19 (Vehicles).)  The phrase "vehicle of the Business" in section 2.3(g) does not use this defined term, which suggests it has a broader meaning.  That broader meaning could mean Existing Vehicles and all vehicles acquired by the Business hereafter; it could mean Existing Vehicles and vehicles that have ever been owned by the Business; or it could have both prospective and retrospective meanings.  In short, the phrase is reasonably susceptible of more than one meaning.

liability is handled in corporate acquisitions, and how it was handled here, as the Asset Purchase Agreement, when read in its entirety, plainly shows.

Without delving into the difficult questions of contract interpretation that Enterprise's proffered construction of the Asset Purchase Agreement presents, my colleagues never address whether the contract language is "reasonably susceptible" to an alternate reading favoring plaintiff. (See *Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912–913.) I cannot join in their analysis. Summary judgment should have been denied because Enterprise presented selective excerpts of the Asset Purchase Agreement which are themselves ambiguous, thus raising a triable issue whether the contract should be construed to include an express assumption of the liability at issue. And upon consideration of what appears to be a nearly complete version of the Asset Purchase Agreement that is in the appellate record (though it was never tendered in support of the statement of undisputed facts), I am even more convinced that plaintiff is entitled to try the issue of express assumption.

## B.     The "Virtual Destruction" Element of *Ray v. Alad*

The trial court did not explain why its finding that Old NCRS's liability was assumed by GM in 1996 entitled Enterprise to summary judgment, but in so concluding it implicitly embraced two arguments Enterprise made in support of summary judgment, and continues to make here on appeal. First, Enterprise argued, and still argues, that there was no "virtual destruction" of plaintiff's remedies because GM—not New NCRS—was the sole corporate successor to Old NCRS by merger, and as a result, plaintiff retained the ability to seek recourse against GM. (*Petrini v. Mohasco Corp.* (1998) 61 Cal.App.4th 1091, 1096, 1098 (*Petrini*) [corporate successor following statutory merger assumes liability of predecessor by operation of law].) Second, and in the alternative, Enterprise argued, and still argues, even if GM was not the sole successor to Old NCRS, any successor liability New NCRS carried forward was cut off in its 2003 bankruptcy. (*Stewart v. Telex Communications, Inc.* (1991) 1 Cal.App.4th 190, 200 (*Stewart*)). The majority erroneously accepts both of these arguments.

*GM as the Purported Sole Successor to Old NCRS*

The first step in Enterprise's "virtual destruction" line of argument is unsustainable. It skips over the fact that, on June 1, 1995—more than a year *before* the merger of Old NCRS (as renamed GM National Holding Co.) into GM—Old NCRS sold substantially all of its assets to NCR Acquisition Corporation (as renamed National Car Rental System Inc.).[9] The majority acknowledges this, but suggests that "NCRS continued to exist as a legal entity under a different name" until it merged with GM. (Maj. opn., *ante*, at p. 5.) But there is nothing in the record showing that after the 1995 asset sale, the predecessor corporation, GM National Holding Co., continued to *operate*, as was the case in *Phillips v. Cooper Laboratories* (1989) 215 Cal.App.3d 1648, where the predecessor corporation, E.S. Miller Laboratories, Inc. continued to operate profitably in changed form for a decade after the asset sale in question. (*Id.* at pp. 1652–1653.) A holding company, in corporate parlance, is not an operating company.

After the June 1995 asset sale, GM National Holding Co. was left with net liabilities of $293.9 million. There is no evidence whatsoever that it was a going concern at this point, in the sense of having adequate resources to cover its debts as they came due. The entity was nothing more than a paper company until GM absorbed it by merger, a step which had previously been ordered by the GM board two months before the asset sale.[10] It is a fair inference from the timing—first the asset sale, followed shortly

---

[9] My colleagues and I, for clarity, refer to National Car Rental System Inc. at this stage in its corporate evolution as New NCRS. In the corporate history after 1996, there were two interim steps before Cerberus's purchase of New NCRS's assets in 2003. In 1997, Republic Industries, Inc. acquired New NCRS in a stock-for-stock exchange, operating it as part of a conglomerate of car sales and rental car businesses for three years. And in 2000, Republic Industries, Inc. spun off its rental car businesses to a company known as ANC Rental Corporation (ANC). It is ANC and its affiliates that filed for bankruptcy in 2003, selling the New NCRS assets to Cerberus at that point.

[10] Certificate of Ownership and Merger Merging GM National Holding Co. Into General Motors Corporation (June 24, 1996), Third Recital (the GM board of directors, "by resolution duly adopted . . . on the 3rd day of April 1995, determined to merge with and into itself GM National Holding Co."). Advance documentation of the mandatory wind-up of GM National Holding Co. was presumably required for GM to take a tax loss

57

thereafter by the merger—that these two steps were part of the same transaction. To this extent, I agree that the proper analysis here is governed by a "straight-forward application" of *Alad* (maj. opn., *ante*, at p. 6), a case where substantially all of the assets of a predecessor (there Alad I) were sold to a successor (there Alad II), followed immediately by liquidation of the predecessor, thus destroying a product liability plaintiff's ability to sue the predecessor. (*Alad*, *supra*, 19 Cal.3d at pp. 26, 33.)[11]

Instead of taking on the 1995 asset sale and grappling with its implications, Enterprise elides the issue by shifting the focus ahead to the GM merger in 1996. Pointing to this second intra-corporate step in the transaction, Enterprise announces that GM, not New NCRS, is the true successor to Old NCRS and accuses plaintiff of adopting "the absurd position" that there were two successors to Old NCRS, GM and New NCRS. Enterprise insists that that cannot be the case. *Alad*, it contends, "did not hold that more than one entity can be held liable as a successor"; rather, "successor liability may apply where, as a *result of the acquisition*, there is no recourse against the original manufacturer at the time of the acquisition." In this case, we are told, "NCRS'[s] acquisition of Old NCRS'[s] assets did not prevent plaintiff from seeking recourse against old NCRS or GM, neither of which were liquidated as part of the sale of old NCRS."

Aside from being contrary to the record—Old NCRS *was* liquidated "as part of" the 1995 asset sale to New NCRS, since the 1996 absorption of Old NCRS into GM was ordered by GM's board shortly *before* the asset sale took place—this argument is legally

---

of $147 million in 1995 on the sale of Old NCRS's assets, which is what was reported in GM's fiscal year 1995 audited consolidated financial statements, as disclosed in GM's SEC Form 10-K that year.

[11] The majority points out that plaintiff pleaded successorship liability under the "mere continuation" and express assumption exceptions, but abandoned any theory of successorship under the de facto merger exception. (Maj. opn., *ante*, at pp. 8–9.) I'm not sure why this is relevant. No one disputes that plaintiff adequately pleaded successor liability generally, which allows her to rely on product line successorship under *Alad*. And based on *Alad*, the record creates a triable issue of successorship liability from Old NCRS to New NCRS as a result of the 1995 asset sale, and that is enough.

wrong.  First, and most fundamentally, it misconceives the nature of corporate successorship.  The rules of successor liability are not designed to pinpoint what entity has the status of the one and only true successor.  The purpose of these rules, instead, is to identify circumstances in which a corporate entity has a sufficient relation to a predecessor entity to trigger an exception to the general rule of corporate successor nonliability, thus allowing us to say that the successor will be held derivatively liable for its predecessor's debts.  Where a corporation, by asset sale, transfers all its assets and goodwill to Corporation No. 1, and then its empty shell, by statutory merger, disappears into Corporation No. 2, *both* Corporation No. 1 and Corporation No. 2 may be said to have a such a relationship to the predecessor—albeit by different routes.  That is what we have in this case.  Plaintiff simply has two different theories of derivative liability (liability under *Alad* vis-a-vis New NCRS, liability under statutory merger principles vis-a-vis GM) that may reach more than one entity in the chain of distribution.

Second, the argument rests on the flawed premise that so long as GM could be held to account for what was left of Old NCRS's liabilities after the dissolution of Old NCRS (upon its merger into GM), there was no "virtual destruction of . . . remedies" (*Alad*, *supra*, 19 Cal.3d at p. 31), and thus there were no liabilities for New NCRS (and hence, ultimately, Cerberus) to inherit.  This line of argument was made in *Kaminski*, where the Western Asbestos Company (Western Asbestos), the original distributor of the asbestos insulation product to which Jack Kaminski was exposed, sold all of its assets to Western MacArthur Company (Western MacArthur).  Two years after the asset sale, Western MacArthur dissolved Western Asbestos.  (*Kaminski*, *supra*, 175 Cal.App.3d at pp. 450–453.)  On appeal from a judgment holding Western MacArthur liable for personal injury to Mr. Kaminski traceable to Western Asbestos's distribution of asbestos long before acquiring its assets, Western MacArthur, relying on the "complete denial of redress" prong of the *Alad* test (*Alad*, *supra*, 19 Cal.3d at p. 32), attempted to argue that successor liability under *Alad* "is only appropriate where the injured plaintiff has no other remedy or recovery against any other defendant." (*Kaminski*, *supra*, 175 Cal.App.3d at p. 459.)

The *Kaminski* court rejected the argument. "Products liability defendants in the chain of commerce suffer joint and several liability," the court explained. (*Kaminski*, *supra*, 175 Cal.App.3d at p. 459.) Because "[t]he presence of another legitimate target defendant in the case does not defeat successor liability against another legitimate defendant," the court construed the phrase "complete denial of redress" in *Alad* to mean "the complete denial of redress *against a major defendant in the chain of commerce*, be it manufacturer or distributor." (*Ibid.*, italics added.) Here, the merger of Old NCRS (as renamed GM National Holding Co.) into GM in 1996 eliminated "a major defendant in the chain of commerce," namely Old NCRS, the rental company that launched the 1992 Oldsmobile into the stream of commerce. It makes no difference that GM remained on the hook for whatever remained of Old NCRS's liabilities after the 1995 asset sale to New NCRS. To adopt the language used in *Kaminski*, the problem with the majority's reliance on *Petrini*, *supra*, 61 Cal.App.4th 1091 is that the merger of Old NCRS into GM "effectively remove[d] the predecessor from the plaintiff['s] pool of recovery." (*Kaminski*, *supra*, 175 Cal.App.3d at p. 456.)

*Greenman* and its progeny authorize consumers injured by defective products to sue any target of their choice within the marketing chain of distribution, from the manufacturer on down the line. Because its predecessor Old NCRS was a cog in GM's marketing machine when the 1992 Oldsmobile involved in this case initially entered the flow of commerce, Enterprise cannot escape liability under these cases by arguing that, following the 1996 merger, plaintiff remained free to sue GM in its place. That argument, in my view, stands the rule of *Greenman* on its head. Recourse against the manufacturer is always an available remedy for a plaintiff in a product liability case, but *Greenman* recognizes it may not be a sufficient one. Indeed, as I see things here, the practical difficulty plaintiff encountered when she attempted to pursue GM—whose bankruptcy arguably serves as the most famous example in United States business history that no company is too big to fail—nicely illustrates the wisdom of the risk spreading rationale on which *Greenman* is founded.

On the facts presented here, plaintiff pursued recovery against multiple targets within the chain of distribution, as was her right. She sued GM, but was stymied when GM went bankrupt. She also sued Enterprise in an effort to trace the current ownership of the National Car Rental brand and assert successor liability against New NCRS. The dispositive issue, then, has nothing to do with the Old NCRS-GM merger and the GM bankruptcy, but rather is whether successor liability may be traced forward from New NCRS to Enterprise by asset sale out of the ANC bankruptcy. Enterprise apparently recognizes this, because at the end of its argument it lays heavy emphasis on *Stewart*, *supra*, 1 Cal.App.4th 190, arguing that "the purchaser of assets out of a bankruptcy is not liable for claims against the bankrupt entity."

*Stewart* was a product liability case involving an accident caused by a defective antenna manufactured by a company called Hy-Gain Electronics Corp. (Hy-Gain). (*Id*. at p. 193.) By the time of the accident, Hy-Gain had filed a voluntary petition of bankruptcy, and in the bankruptcy proceedings Telex Communications, Inc. (Telex) bought all of its assets and goodwill and continued manufacturing antennas using its blueprints and trademark. (*Id*. at p. 194.) Declining to apply *Alad*, the *Stewart* court held that Telex could not be held liable on a corporate successor theory because it was the voluntary bankruptcy of Hy-Gain, not the asset sale to Telex, that caused the destruction of the plaintiff's remedies against Hy-Gain. (*Id*. at pp. 195–200.)

The majority suggests that the principle announced in *Stewart* has been "applied in both state and federal cases as a matter of California law[.]" (Maj. opn., *ante*, at p. 14.) To the extent this implies *Stewart* is part of a well-established vein of precedent not only in California but elsewhere, that is simply not the case. For the most part, we are talking about a few scattered federal district court decisions, plus *Nelson v. Tiffany Industries, Inc.* (9th Cir. 1985) 778 F.2d 533 (*Nelson*), a federal diversity case which simply reflects the Ninth Circuit's prediction in 1985 of how the California Supreme Court would apply *Alad*. Other than *Stewart* itself, that prediction has not borne much fruit. Over the course of nearly three decades, *Stewart* has been cited twice in published California appellate

decisions, both times on background points of law and not once for its central holding on destruction of remedies in the context of a Chapter 11 bankruptcy.[12]

I respectfully disagree that *Stewart* and other cases in this rather thin body of precedent "turn on whether the successor corporation *caused the financial difficulties* that led the predecessor to be unavailable to cover liabilities to future tort victims." (Maj. opn., *ante*, at p. 15, italics added.) As I read these cases, they hold more narrowly that, absent evidence that a purchaser of assets in bankruptcy colluded with the bankrupt entity by inducing it to file for Chapter 11 protection, such a purchaser cannot be said to have "caused" the destruction of future tort claimants' remedies. (*Nelson*, *supra*, 778 F.2d at p. 538; see *Stewart*, *supra*, 1 Cal.4th at p. 200, fn. 5.) The logic is that, since Chapter 11 bankruptcy is designed to give the bankrupt entity a fresh start free of "inchoate and unknown tort liability" (*Stewart*, *supra*, 1 Cal.App.4th at p. 200)—at least that is how the *Stewart* court understood what always happens in a voluntary bankruptcy—the bankruptcy process is, in effect, an intervening cause, which breaks any chain of causation traceable to the buyer. (See *ibid.* [adopting the reasoning in *Nelson* that " 'it was Moody's bankruptcy and not Tiffany's subsequent purchase of the assets that destroyed Nelson's remedies' "].)

*Stewart* grounded its holding in bankruptcy policy, explaining that the discharge of indebtedness in bankruptcy "could be inhibited by a holding that assets of the bankrupt would be infected with the bankrupt's inchoate and unknown tort liability," since that kind of legacy exposure would tend to drive down the price in any sale of the bankrupt's assets. (*Stewart*, *supra*, 1 Cal.App.4th at p. 200.)[13] In my view, *Stewart* does not resolve

---

[12] See *Pepperell v. Scottsdale Ins. Co.* (1998) 62 Cal.App.4th 1045, 1054; *Wright v. Stang Manufacturing Co.* (1997) 54 Cal.App.4th 1218, 1223, fn. 1.

[13] The assumption driving this policy rationale—that there is a preference in Chapter 11 bankruptcy for promoting the discharge of indebtedness by ridding the debtor of "inchoate and unknown tort liability" in order to maximize value in a sale of assets—is a matter of considerable controversy among bankruptcy specialists. (See Swett, *"Free and Clear" Bankruptcy Sale Orders and State Law Successor Liability Claims: The Overlooked Question of Preemption* (2017) 25 Am. Bankr. Inst. L.Rev. 275, 309

anything here. Even if it were the case that, in theory, successor liability of Cerberus and hence of Enterprise on unknown, yet-to-be-asserted claims could have been cut off in the bankruptcy process—more on that below—there is a triable issue on express assumption. Thus, before deciding the applicability and reach of *Stewart* on this record, it is important to understand that all the case does is bring us back to the question whether there was an express assumption by Cerberus of potential liability to plaintiff out of the ANC bankruptcy in 2003. Only if there was not, as a matter of law, must we address *Stewart*.

I do think it is worth pointing out, however, that *Stewart* should be read with caution. The notion that a Chapter 11 bankruptcy can insulate the bankrupt entity, and hence purchasers of its assets, against what the *Stewart* court calls "inchoate and unknown tort liability" (*Stewart*, *supra*, 1 Cal.App.4th at p. 200) has long been a controversial one. That issue turns on whether, prior to confirmation of the bankrupt's plan of reorganization, the bankruptcy trustee may, in effect, shed corporate successor liability by obtaining an order approving a sale of the bankrupt corporation's assets "free and clear of any interest in such property of an entity other than the estate" under 11 United States Code section 363(f) (section 363(f)). Most courts hold that successor liability claims may be considered "interest[s] in property" that may be extinguished under section 363(f).[14] But a growing body of law has developed recognizing an important caveat: For successor liability to be extinguished at the time of the bankruptcy

---

["Maximizing the estate on the backs of tort victims is not an imperative that can be found in the [Bankruptcy] Code. And the idea that successor liability emanating from product-related tort claims should be extinguished for the sake of equality of distribution clashes in several different ways with usual premises of bankruptcy law."].)

[14] *In re Trans World Airlines, Inc.* (3d Cir. 2003) 322 F.3d 283, 288–291; *In re Leckie Smokeless Coal Co.* (4th Cir. 1996) 99 F.3d 573, 581–582, 585–587; see *In re Paris Industries Corp.* (Bankr. D.Me. 1991) 132 B.R. 504, 507–510; *In re All American of Ashburn, Inc.* (Bankr. N.D.Ga. 1986) 56 B.R. 186, 189–190; Kuney, *Misinterpreting Bankruptcy Code Section 363(f) and Undermining the Chapter 11 Process* (2002) 76 Am. Bankr. L.J. 235, 267 ("the dominant interpretation [of] . . . § 363(f) [is that it] can be used to sell property free and clear of claims that could otherwise be assertable against the buyer of the assets under the common law doctrine of successor liability").

there must be an existing claim against the debtor, or short of that, some basis to identify a relationship between a putative claimant's right to demand money and the debtor's use of the assets, or appropriate notice to potential claimants.[15]

       3.     *Elliott v. GM LLC* (*In Matter of Motors Liquidation Co.*)

Given the limited nature of a bankruptcy court's ability to extinguish future successor liability claims under section 363(f), I think plaintiff is correct to rely on the latest circuit-level case to address the issue, *Elliott v. GM LLC* (*In Matter of Motors Liquidation Co.*) (2d Cir. 2016) 829 F.3d 135 (*Elliott*), for the proposition that an asset sale does not eliminate successor liability arising from unknown claims at the time of sale.  The majority suggests this limitation on the reach of federal bankruptcy law is "a different question not relevant" to the state law principle of successor liability announced in *Stewart* (maj. opn., *ante*, at p. 15), but I do not agree that the two questions can be so easily separated.  Even Enterprise argues that "[t]he federal bankruptcy law curtails the plaintiff's remedies, not the asset sale transaction."  That is a fair reading of *Stewart*, which presupposes a voluntary Chapter 11 proceeding in which unknown claims are cut off.  (*Stewart*, *supra*, 1 Cal.App.4th at pp. 195–200.)  At the time *Stewart* was decided,

_____

[15] See *In re Savage Industries, Inc.* (1st Cir. 1994) 43 F.3d 714, 720–722 (successor liability claim, even if it constituted an "interest" under § 363(f), could not be extinguished where no notice provided to claimant); *Truck Drivers Union v. Tasemkin, Inc.* (7th Cir. 1994) 59 F.3d 48, 50–51 (successor liability claim could proceed and was not cut off by prior bankruptcy proceeding); see generally *In re Piper Aircraft Corp.* (Bankr. S.D.Fla. 1994) 162 B.R. 619, 623–624, 627–629 (unknown future claimants lacked any prepetition relationship with debtor's conduct and thus had no claims in bankruptcy proceeding); *In re Fairchild Aircraft Corp.* (Bankr. W.D.Tex. 1995) 184 B.R. 910, 917–918, 923–924, 933, vacated on other grounds (Bankr. W.D.Tex. 1998) 220 B.R. 909; American Bankruptcy Institute, 22nd Annual Spring Meeting (2004) *Concurrent Session: Successor Liability Revisited: Recent Developments and Trends*, Cohen, *Successor Liability in Section 363 Sales*, 041504 ABI-CLE 487, text accompanying fn. 17 ("There appears to have developed a bright-line rule that the failure to provide an identifiable holder of a successor liability claim with adequate notice of the bankruptcy in which a sale purports to be free and clear of successor liability claims renders the sale subject to that successor liability claim.  The lack of notice is a defect of constitutional dimensions.").

bankruptcy law on this point was undeveloped. Not so anymore. Certainly after *Elliott*, we now know that liability on unknown claims may be cut off, protecting purchasers in a sale of business assets, only in certain narrowly defined circumstances.

Confirming a trend going back three decades in federal bankruptcy law, *Elliott* confined the scope of the "free and clear" order in that case to disclosed claims for which there was "(1) a right to payment (2) that arose before the filing of the petition" or resulted from " 'pre-petition conduct fairly giving rise to' " the claim in circumstances where there was "some contact or relationship between the debtor and the claimant such that the claimant is identifiable." (*Elliott*, *supra*, 829 F.3d at p. 156.) Under that holding as applied here, to obtain an effective "free and clear" order, the onus was on the debtor in the 2003 bankruptcy, ANC, to give notice to potential claimants, effectively charging it with the necessary knowledge to identify the potential for such claims. (*Id*. at p. 160.) To the extent *Stewart* rests on a different understanding of how Chapter 11 bankruptcy works, I think more recent developments in bankruptcy law have cast the breadth of its reasoning into doubt.

Subject to section 363(f) of the Bankruptcy Code, a corporate asset sale in a Chapter 11 proceeding should be treated like any other corporate asset sale for purposes of *Alad*. If the buyer of a product line in that setting succeeds to substantially all of its predecessor's assets and goodwill, it inherits whatever product liability exposure the acquired product line carried with it, unless a "free and clear" order narrows the scope of inherited liability. That is because, where the predecessor does not continue in the line of business it has sold—here, there is no question that after 2003 there was nothing left of ANC's National Car Rental business—the purchase of assets in a Chapter 11 bankruptcy does not, by itself, "cause" the destruction of remedies of future product liability claimants. Only a "free and clear" order can block such claims, and even where there is such an order, it will destroy remedies for purposes of *Alad* only to the extent *Elliott* permits extinguishment of inherited liability.

The bottom line is this. The issue presented here is not that we are called upon to apply a state law rule of successor liability (under *Stewart*), rather than a federal

65

bankruptcy rule (under *Elliott*), but instead whether we should reconcile those two adjacent legal regimes. In my view, we should—by holding that the rule of *Stewart* applies only when the criteria in *Elliott* for enforcing a federal bankruptcy court's "free and clear" order cutting off yet-to-be-asserted claims have been satisfied. Unless we reconcile the tension between these two lines of authority in this way, who knows what unintended confusion we could be sowing in an area of law where predictability and certainty are as important as they are in bankruptcy.[16] Accordingly, because there is no proof in the summary judgment record bearing on what the scope of the "free and clear order" for the ANC-Cerberus asset sale was, or whether notice satisfying the rule in *Elliott* was given, I would conclude that *Stewart* does not apply, even assuming there were no triable issue on express assumption.

* * * * * * *

This case presents two issues in the field of product liability law, the first involving an application of the stream of commerce doctrine of *Greenman*, *supra*, 59 Cal.2d 57, and *Vandermark*, *supra*, 61 Cal.2d 256, and the second involving an application of the closely related corporate successorship doctrine of *Alad*, *supra*, 19 Cal.3d 22. Both are close questions that have arisen persistently over the years but that have not been definitively resolved. They both are deserving of the California Supreme Court's attention, if not in this case in some future case.

_____<br>Streeter, Acting P.J.

---

[16] See *Butner v. United States* (1979) 440 U.S. 48, 55 ("Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum-shopping, and to prevent a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy.' ").

Trial Court:                    San Mateo County Superior Court

Trial Judge:                    Hon. Richard H. DuBois

Counsel for Appellant:          Law Offices of Carcione, Cattermole, Dolinski, Stucky, Markowitz & Carcione, Joseph W. Carcione, Jr., Aaron B. Markowitz and Joshua S. Markowitz for Appellant

Counsel for Respondents:        Crowell & Moring, Douglas W. Sullivan and Rebecca M. Suarez; Yukevich Cavanaugh, James. J. Yukevich and Delmar S. Thomas for Respondents